[No. 8081. *En Banc.* May 3, 1910.]

CARSTENS PACKING COMPANY, *Respondent*, v. SOUTHERN PACIFIC COMPANY, *Appellant*.[1]

CARRIERS—OF LIVE STOCK—CONTRACTS—EXEMPTION FROM LIABILITY—PUBLIC POLICY. A statute providing that a railway carrier of live stock cannot exempt itself from liability for losses or injuries caused by its own negligence is a rule of public policy in this state.

SAME—CONTRACTS—VALIDITY—WHAT LAW GOVERNS. An exemption by contract from liability for negligence by a railroad transporting live stock into this state, contrary to the provisions of Rem. & Bal. Code, § 8648, is void as against public policy, although valid under the laws of the state where the contract was made; and comity does not require its enforcement in this state.

SAME—CLAIMS FOR LOSS—EVIDENCE—ADMISSIBILITY. In an action for injuries to live stock transported by defendant under a contract requiring claims for loss sustained to be made in writing within ten days after unloading the stock, evidence of abnormal shrinkage in weight is admissible without a bill of particulars or specification of the item, where the claim was for loss and damage due to rough handling, bruises, and depreciation in value, and opportunity was given to inspect the stock on arrival at its destination.

SAME—EVIDENCE OF NEGLIGENCE—SUFFICIENCY. The evidence is sufficient to sustain a verdict for loss and damage to cattle transported, through negligent rough handling of the train by the carrier, although the testimony of the shipper's representative accompanying the stock could not be obtained, where there was evidence tending to show the condition of the cattle when shipped, and when delivered, and that a great number were so seriously bruised as to be unsalable.

Appeal from a judgment of the superior court for Pierce county, Chapman, J., entered November 20, 1908, upon the verdict of a jury rendered in favor of the plaintiff, in an action of tort. Affirmed.

[1]Reported in 108 Pac. 613.

*Wm. D. Fenton, R. A. Leiter,* and *Peters & Powell,* · for appellant, contended, among other things, that it is not sufficient to show that the stock arrived at its destination in an injured condition.    Hutchinson, Carriers, § 1357; Elliott, Railroads (2d ed.), § 1549; *Terre Haute & L. R. Co. v. Sherwood,* 132 Ind. 129, 31 N. E. 781, 32 Am. St. 239, 17 L. R. A. 339; *St. Louis etc. R. Co. v. Weakly,* 50 Ark. 397, 8 S. W. 134, 7 Am. St. 104; *Peterson v. Chicago etc. R. Co.,* 19 S. D. 122, 102 N. W. 595; *St. Louis S. W. R. Co. v. Vaughan* (Tex. Civ. App.), 41 S. W. 415; *Pennsylvania R. Co. v. Raiordon,* 119 Pa. St. 577, 13 Atl. 324, 4 Am. St. 670.    Under the laws of California, the contract was valid. *Donlon Bros. v. Southern Pac. Co.,* 151 Cal. 763, 91 Pac. 603, 11 L. R. A. (N. S.) 811; *Michalitschke Bros. & Co. v. Wells, Fargo & Co.,* 118 Cal. 683, 50 Pac. 847; *Pierce v. Southern Pac. Co.,* 120 Cal. 156, 47 Pac. 874, 52 Pac. 302, 40 L. R. A. 350; *St. Louis & S. F. R. Co. v. Kimberlin* (Tex. Civ. App.), 111 S. W. 671; California Civil Code, §§ 2174-2176.    And the laws of California govern.    1 Hutchinson, Carriers, § 199 *et seq.    La Selle v. Woolery,* 14 Wash. 70, 44 Pac. 115, 53 Am. St. 855, 32 L. R. A. 73; *Hunter v. Wenatchee Land Co.,* 36 Wash. 541, 79 Pac. 40; *Palmer v. Atchison etc. R. Co.,* 101 Cal. 187, 35 Pac. 630.

*Ellis, Fletcher & Evans,* for respondent.

PARKER, J.—This was an action to recover for loss and injuries to cattle in four shipments from points in California to Tacoma, in this state.    Each shipment was made the basis of a separate cause of action.    The loss and injuries occurring in the second, third, and fourth shipments it is alleged were caused by the defendant's negligence in the operation of its trains, and also by its failure to provide reasonably safe unloading facilities at Gazelle, California, where the cattle were unloaded for water, food and rest.    The loss and injuries occurring in the first shipment are alleged to be the result of defendant's negligence in the operation of its

trains.   The defendant by its answer denied all negligence upon its part, and alleged that the shipments were made under written contracts upon the terms and conditions of which, and not otherwise, it undertook to transport the cattle from the several points in California to Tacoma, setting forth the contracts, containing the following:

"That in no event is first party or its lessors to be liable for any loss of, or damage to, said live stock not proven to have been caused by the gross negligence of first party in the performance of or failure to perform some duty which under the terms of this contract, is due from first party to second party as to said live stock."

Defendant also alleged that, under the law of California where the contracts were made, such agreed exemption from liability is permissible, and set forth the sections of the civil code of California showing that such stipulated exemption is valid in that state.   The trial resulted in a verdict in favor of the plaintiff upon each cause of action.   Judgment was entered thereon, and upon the denial of defendant's motion for a new trial, it appealed to this court.

The learned trial court instructed the jury, in substance, that the defendant could not stipulate against its own negligence, and refused to give instructions requested by appellant's counsel to the effect that it could be held liable for its gross negligence only.   This is assigned as error by counsel for appellant, upon which assignment it is contended that, since this contract was executed in California, and the law of California sustains the validity of the provision therein limiting the liability of appellant as against its own negligence, other than gross negligence, the law of California must govern in determining the construction and validity of that part of the contract and the respective rights of the parties thereunder.   Of course the general rule is that the law of the place of the making of a contract controls in determining the rights and liabilities of the parties thereto. This rule, it is contended by learned counsel for respondent,

has its exceptions and qualifications, and does not control in this case, because the limitations attempted to be placed upon appellant's liability resulting from its negligence, other than its gross negligence, is in contravention of the public policy of this state, and, therefore, when sought to be enforced in the courts of this state, should be regarded as void, and that appellant's liability for its negligence should be determined regardless of such provision. At the time of the making of the contracts it was a part of the statute law of this state, Laws of 1907, p. 691 [Rem. & Bal. Code, § 8648 *et seq.*],

"That no contract, receipt, rule, or regulation shall exempt any corporation engaged in transporting live stock by railway from liability of a common carrier, or carrier of live stock, which would exist had no contract, receipt, rule, or regulation been made or entered into."

It hardly needs argument to demonstrate that this is a declaration of public policy. Clearly, its enactment was prompted by a concern for the public welfare. It is in keeping with the law existing in many of the states of the Union, touching the power of public carriers to limit their liabilities and lessen their duties as such by rule or contract. Upon the question of attempting to so limit their liability against their own negligence, in Moore on Carriers, 313, it is stated:

"The doctrine is established by the great weight of authority in this country that a carrier cannot by stipulation or contract relieve or exempt itself from liability for losses or injuries caused by its own negligence or want of care and skill, or that of its servants, or by its own or their wilful default, misfeasance or tort. Public policy and every consideration of right and justice, it is held, demands that the right of the owners to absolute security against the negligence of the carrier, and of all persons engaged in performing its duty, shall not be taken away by any reservation in its receipt, or by any arrangement, contract or stipulation entered into. Such contracts are, therefore, declared to be void as being unreasonable and contrary to public policy and afford no protection to the carrier."

This court has recently recognized this rule in *Bartelt v. Oregon R. & Nav. Co.*, 57 Wash. 16, 106 Pac. 487. In view of the importance of the question involved, we deem it appropriate to notice the reasons upon which this doctrine rests. They have been ably stated by Justice Bradley, speaking for the supreme court of the United States, in the case of *Railroad Co. v. Lockwood*, 84 U. S. 357, 378. We quote from that decision at some length, commencing at page 378:

"It is a favorite argument in the cases which favor the extension of the carrier's right to contract for exemption from liability, that men must be permitted to make their own agreements, and that it is no concern of the public on what terms an individual chooses to have his goods carried. . . .

"Is it true that the public interest is not affected by individual contracts of the kind referred to? Is not the whole business community affected by holding such contracts valid? If held valid, the advantageous position of the companies exercising the business of common carriers is such that it places it in their power to change the law of common carriers in effect, by introducing new rules of obligation.

"The carrier and his customer do not stand on a footing of equality. The latter is only one individual of a million. He cannot afford to higgle or stand out and seek redress in the courts. His business will not admit such a course. He prefers, rather, to accept any bill of lading, or sign any paper the carrier presents; often, indeed, without knowing what the one or the other contains. In most cases, he has no alternative but to do this, or abandon his business. . . .

"If the customer had any real freedom of choice, if he had a reasonable and practicable alternative, and if the employment of the carrier were not a public one, charging him with the duty of accommodating the public in the line of his employment; then, if the customer chose to assume the risk of negligence, it could with more reason be said to be his private affair, and no concern of the public. But the condition of things is entirely different, and especially so under the modified arrangements which the carrying trade has assumed. The business is mostly concentrated in a few powerful corporations, whose position in the body politic enables them to control it. They do, in fact, control it, and impose such conditions upon travel and transportation as they see fit, which

the public is compelled to accept. These circumstances furnish an additional argument, if any were needed, to show that the conditions imposed by common carriers ought not to be adverse (to say the least) to the dictates of public policy and morality. The status and relative position of the parties render any such conditions void. Contracts of common carriers, like those of persons occupying a fiduciary character, giving them a position in which they can take undue advantage of the persons with whom they contract, must rest upon their fairness and reasonableness. It was for the reason that the limitations of liability first introduced by common carriers into their notices and bills of lading were just and reasonable, that the courts sustained them. It was just and reasonable that they should not be responsible for losses happening by sheer accident, or dangers of navigation that no human skill or vigilance could guard against; it was just and reasonable that they should not be chargeable for money or other valuable articles liable to be stolen or damaged, unless apprised of their character or value; it was just and reasonable that they should not be responsible for articles liable to rapid decay, or for live animals liable to get unruly from fright and to injure themselves in that state, when such articles or live animals became injured without their fault or negligence. And when any of these just and reasonable excuses were incorporated into notices or special contract assented to by their customers, the law might well give effect to them without the violation of any important principle, although modifying the strict rules of responsibility imposed by the common law. The improved state of society and the better administration of the laws, had diminished the opportunities of collusion and bad faith on the part of the carrier, and rendered less imperative the application of the iron rule, that he must be responsible at all events. Hence, the exemptions referred to were deemed reasonable and proper to be allowed. But the proposition to allow a public carrier to abandon altogether his obligations to the public, and to stipulate for exemptions that are unreasonable and improper, amounting to an abdication of the essential duties of his employment, would never have been entertained by the sages of the law. . . .

"Conceding, therefore, that special contracts, made by common carriers with their customers, limiting their liability, are good and valid so far as they are just and reasonable;

to the extent, for example, of excusing them for all losses happening by accident, without any negligence or fraud on their part; when they ask to go still further, and to be excused for negligence—an excuse so repugnant to the law of their foundation and to the public good—they have no longer any plea of justice or reason to support such a stipulation, but the contrary. And then, the inequality of the parties, the compulsion under which the customer is placed, and the obligations of the carrier to the public, operate with full force to divest the transaction of validity."

It is clear that if this contract had been made within the state of Washington for shipments from and to points within the state, the provisions thereof attempting to limit the liability of the appellant against its negligence would be regarded as void. What then is the effect of such a provision in a contract made in a state where the law regards it as binding upon the parties, when such contract is to be performed, at least in part, in our own state? Must the law of the place of executing the contract control when rights such as here involved are brought in question in our courts? Does the comity which exists between sovereign states compel us to measure the rights of the parties by such a provision even though it violates the public policy in our state? It may be conceded that in many of the states of the Union the law of the state wherein such contracts as here involved are made is held to govern, even though the public policy of the state in which the contract is sought to be enforced is thereby violated. In this state the question is here presented for the first time, and we are therefore not bound by any previous decisions or expressions of our own upon the subject. In solving the problem then, we feel constrained to follow the views of the supreme court of the United States, not only because it is the highest authority in our land, but because those views appeal to our sense of right and are, we think, most in keeping with the spirit of the age. Let us notice some of the decisions of that court.

In the case of *Oscanyan v. Arms Co.*, 103 U. S. 261, a consul general of the Turkish government residing in this

country entered into a contract whereby, in consideration of a certain percentage, he agreed to use his influence in favor of an arms company with his government, to promote a sale of arms by the company to his government; and the sale having been consummated, he sued to recover his percentage. It required but little argument to show that such a contract was against public policy in this country. It is true the contract was made in this country, but it was pointed out that the Turkish government did not object to its officer taking commission on such contract. The court disposed of the case as though that were the fact, and treated the contract somewhat as though it had been made in Turkey. Justice Field, speaking for the court, said at page 277:

"But admitting this to be otherwise, and that the Turkish government was willing that its officers should be allowed to take commissions on contracts obtained for it by their influence, that is no reason why the courts of the United States should enforce them. Contracts permissible by other countries are not enforceable in our courts, if they contravene our laws, our morality, or our policy. The contract in suit was made in this country, and its validity must be determined by our laws. But had it been made in Turkey, and were it valid there, it would meet with the same reprobation when brought before our courts for enforcement.

"The general rule undoubtedly is that the validity of a contract is to be decided by the law of the place where it is made, unless it is to be performed in another country; but to this, as to all general rules, there are exceptions, and among these Story mentions contracts made in a foreign country to promote or reward the commission of crime, to corrupt or evade the due administration of justice, to cheat public agents, or to affect the public rights, and other contracts which in their nature are founded in moral turpitude, and are inconsistent with the good order and solid interest of society. 'All such contracts,' he adds, 'even although they might be held valid in a country where they are made, would be held void elsewhere, or at least ought to be, if the dictates of Christian morality, or even of natural justice, are allowed to have their due force and influence in the administration of

international jurisprudence.' Story, Conflict of Laws, § 258."

In the case of *The Kensington*, 183 U. S. 263, the effect of our public policy upon the attempted enforcement of a contract made in a foreign country, similar to the contract here involved, was brought in question. In that case there was involved a loss of baggage of a passenger upon a steamship bound from Antwerp to New York. Among other conditions printed upon the ticket of the passenger, and which formed a part of the contract, it was provided that the shipowner should not be liable for loss of baggage from any act, neglect, or default of the shipowner's servants. This limitation of liability appeared to be valid under the laws of Belgium, where the ticket was purchased and the contract for passage made. Justice White in discussing the effect of such provision, when it was attempted to be invoked as a defense in a suit for the loss of the baggage in a Federal court of this country, commencing at page 268, said:

"It is settled in the courts of the United States that exemptions limiting carriers from responsibility for the negligence of themselves or their servants are both unjust and unreasonable, and will be deemed as wanting in the element of voluntary assent; and, besides, that such conditions are in conflict with public policy. This doctrine was announced so long ago, and has been so frequently reiterated, that it is elementary. We content ourselves with referring to the cases of the *Baltimore & Ohio etc. Railway v. Voigt*, 176 U. S. 498, 505, 507, and *Knott v. Botany Mills*, 179 U. S. 69, 71, where the previously adjudged cases are referred to and the principles by them expounded are restated. . . .

"Testing the exemptions found in the ticket by the rule of public policy, it is apparent that they were void, since they unequivocally sought to relieve the carrier from the initial duty of furnishing a seaworthy vessel, for all neglect in loading or stowing, and indeed for any and every fault of commission or omission on the part of the carrier or his servants. And seeking to accomplish these results, it is equally plain that the conditions were void if their legality be considered solely with reference to the modifications of the

general rule created by the act of 1893. *Knott v. Botany Mills, supra.* As, however, the ticket was finally countersigned in Belgium, and one of the conditions printed on its face provides that 'all questions arising hereunder are to be settled according to the Belgium law, with reference to which this contract is made,' it is insisted that such law should be applied, as proof was offered showing that the law of Belgium authorized the conditions. The contention amounts to this: Where a contract is made in a foreign country, to be executed at least in part in the United States, the law of the foreign country, either by its own force or in virtue of the agreement of the contracting parties, must be enforced by the courts of the United States, even although to do so requires the violation of the public policy of the United States. To state the proposition is, we think, to answer it. It is true, as a general rule, that the *lex loci* governs, and it is also true that the intention of the parties to a contract will be sought out and enforced. But both these elementary principles are subordinate to and qualified by the doctrine that neither by comity nor by the will of contracting parties can the public policy of a country be set at naught. Story, Conflict of Laws, Secs. 38, 244. Whilst as said in *Knott v. Botany Mills*, the previous decisions of this court have not called for the application of the rule of public policy to the precise question here arising, nevertheless, that it must be here enforced is substantially determined by the previous adjudications of this court. In *Liverpool & Great Western Steam Co. v. Phoenix Insurance Co.*, 129 U. S. 397, the question arose, whether conditions, exempting a carrier from responsibility for loss caused by the neglect of himself, or his servants, could be enforced in the courts of the United States, the bill of lading having been issued in New York by a British ship for goods consigned to England. Despite the fact that conditions, exempting from responsibility for loss, arising from negligence, were valid, by the laws of New York, and would have been upheld in the courts of that state, it was decided that, in view of the rule of public policy applied by the courts of the United States, effect would not be given to the conditions. In the very nature of things, the premise, upon which this decision must rest, is controlling here, unless it be said that a contract, made in a foreign country, to be executed in part in the United States, is more

potential to overthrow the public policy, enforced in the courts of the United States, than would be a similar contract, validly made, in one of the states of the Union. Nor is the suggestion that, because there is no statute expressly prohibiting such contracts, and because it is assumed no offense against morality is committed in making them, therefore they should be enforced, despite the settled rule of public policy to the contrary. The existence of the rule of public policy, not the ultimate causes upon which it may depend, is the criterion. The precise question has been carefully considered and decided in the District Courts of the United States. In *The Guild Hall*, 58 Fed. Rep. 796, it was held that a stipulation in a bill of lading issued at Rotterdam on goods destined to New York, exempting the carrier from liability for negligence, would not be enforced in the courts of the United States, although such a condition was valid under the law of Holland. In *The Glenmavis*, 69 Fed. Rep. 472, the same rule was applied to a bill of lading issued in Germany by a British ship for goods consigned to Philadelphia."

Are not these considerations sufficient to show that no rule of comity requires us to ignore the declared public policy of our state, in order that the terms of a contract made in another state shall be recognized as valid here, simply because such terms are valid where made. Is it not as much our right and duty to withhold the aid of our courts from the enforcement of such a provision as if it were made part of a contract entered into here? Is not the state of Washington as much a sovereign as the nation, as to the matter here involved? We see no more reason for yielding our public policy to the end that this attempted limitation upon appellant's liability may be enforced here than there would be for the highest court of the nation overriding a rule of public policy to the end that a contract made in a foreign country might be enforced here. We are of the opinion that the provisions of these contracts, sought to be invoked as a defense by the appellant, are clearly in violation of the public policy of our state, and should not be recognized as valid here although admitted to be valid and enforceable in the

state where the contracts were made. The action of the learned superior court in giving instructions, and refusing those requested by. appellant upon this question, was not erroneous.

The contracts provided, among other things, that claims for loss or damage sustained by the shipper should be made in writing within ten days after unloading the stock, and failure to so make such claim should operate as a waiver and release. Respondent filed four separate claims for damages, one for each shipment. They differ somewhat in their language, but the purport of each was a claim for loss and damage due to rough handling and improper facilities for loading and unloading at Gazelle, California, and that the cattle were badly bruised and depreciated in value. The evidence also shows that appellant was given notice and opportunity to inspect the cattle on arrival at Tacoma..

It is contended on behalf of appellant that the trial court erred in admitting evidence of abnormal shrinkage in the weight of the cattle resulting from their shipment. This contention is based on the alleged want of notice of such claim, as the claims did not mention shrinkage in weight as one of the items going to make up the total amount of the damages claimed. However, these claims gave appellant notice of the cause of the damage so it could by prompt investigation become fully informed relative thereto. We think this was a substantial compliance with the provisions of the contract, especially in view of the notice and opportunity given appellant for inspection upon the arrival of the cattle, and that respondent was entitled to prove any damage which was the natural and probable result of such cause, without furnishing with its claim a bill of particulars showing the items of damage. We think evidence of shrinkage was admissible, conceding, though not deciding, that the question is not controlled by the Law of 1907 above quoted [Rem. & Bal. Code, § 8648 et seq.].

It is also contended that the evidence was wholly insufficient

to support respondent's fourth cause of action, which related to the first shipment. There was evidence tending to show that the loss and injuries in connection with this shipment occurred while the cattle were upon the appellant's road. Such fact could be fairly inferred by the jury from the evidence of the condition in which the cattle were delivered to appellant for shipment, and the condition in which they were received at Tacoma, and the evidence tending to show that the injuries did not occur while on the Northern Pacific road between Portland and Tacoma. Witness Belcher testified as to the nature and extent of the injuries to the cattle in this shipment, consisting of five car loads, upon their arrival at Tacoma, as follows:

"Q. Now what was their condition? A. Well, on the first shipment, I don't remember whether it was a cow or steer, one particular animal had the whole loin knocked out; had to be trimmed up on account of being bruised and the others were bruised. The sides were bruised. The hind quarters were badly bruised, indicating that they had been down somewhere and gotten their legs bruised, and they had to be trimmed so that there was practically—part of them practically nothing but their ribs left. No meat on them at all. Q. How extensively? Any number of the cattle on this first shipment that were not bruised more or less? A. They were all bruised more or less. I only took a record of those that were bruised so badly that they could not be turned out or sold as fresh meat; had to be trimmed up. Q. Do you remember how many there were? A. I believe there was 98 in that bunch. Q. That were injured so that they could not be turned out? A. Yes, sir. Q. What do you mean by turned out? A. Sold to our trade just as they stood. Q. And how about the rest of them? A. They were all bruised. They all had bruises on them more or less. I didn't think it worth while to make a note of those that were not bruised badly enough to have to be cut up. Q. Were the rest of them damaged in value to any extent? A. They were. Q. To what extent? A. Well, you would have to average it. The entire shipment I should say was damaged to the extent of about three or four cents a pound at least. Q. That is taking those that were absolutely and entirely damaged and those that were partially

damaged and averaged together? A. Yes, sir. Mr. Powell: Do I understand that you mean to say, Mr. Belcher, testify here that the whole shipment of all the cattle averaging would be a damage of three or four cents? A. I do. Q. Per pound? A. I do. . . . Q. Mr. Belcher, do you know how much from these cattle in the first shipment we are inquiring about, had to be trimmed off and not used at all. A. I think there was about three quarters of the animals that went into the cutting room that had to be turned into fertilizer. Q. Do you mean three fourths of all of the animals? A. No, three fourths of ninety eight. Probably a quarter of the ninety eight was good. Q. A quarter of the 98? A. Yes."

One Pauley, an employee of respondent, accompanied the train which carried the cattle, as the contract provided, but he could not be secured as a witness at the trial, so respondent had to rely upon evidence of the nature above mentioned, not having witnesses with personal knowledge of what occurred to the cattle while in transit. Appellant's counsel argue that where the shipper accompanies the shipment under the contract, the burden is upon him to show that the injuries to the stock were caused by the negligence of the carrier, and not by the stock themselves or the negligence of the shipper, and the proof of the damaged condition in which the stock were received was not sufficient; as it might be in case of a shipment without being accompanied by the shipper.

It may be conceded that ordinarily in such case the shipper must prove something more than the mere damaged condition of the property when received from the carrier, but if the nature and extent of the damages proven is such that the jury may reasonably infer therefrom that it was caused by the rough handling of the carrier's train, it seems to us that such proof would be sufficient to sustain a finding that the damage was caused by the carrier's negligence. The evidence tending to show the nature of the bruises upon the cattle, the great number of them so bruised and injured, their abnormal shrinkage, together with their general condition at the end of the journey, we think was sufficient to

warrant the jury in finding such injuries were the result of appellant's negligence. The evidence in support of the other cause of action is also challenged, but since it is of substantially the same nature as that relating to the first shipment, and has the additional support of testimony of witnesses who accompanied the shipments, it was sufficient to support the verdict.

We are of the opinion that the judgment should be affirmed. It is so ordered.

FULLERTON, GOSE, DUNBAR, CROW, MOUNT, and CHADWICK, JJ., concur.