[No. 17488.    Department One.    February 1, 1923.]

THE YOKOHAMA SPECIE BANK, LIMITED, *Appellant,* v. UNITED STATES FIDELITY & GUARANTY COMPANY *et al., Respondents.*[1]

CARRIERS (23, 26)—DELIVERY BY CARRIER—LIABILITY FOR WRONG-FUL DELIVERY—FAILURE TO TAKE UP BILL—ACTIONS. Where foreign oil was shipped to be delivered on order of the shipper, under a contract with the importer for payment by sixty-day sight draft secured by letters of credit, according to established custom, and the shipments went forward before letters of credit were supplied, as demanded, the shipper's cablegram to the importer that the vessel would "arrive ahead of documents. Take immediate delivery and cable credit at once," was a mere dun to supply the credit, and did not authorize the carrier to make delivery of the cargo without the documents; hence the importer, the carrier and a bonding company are all liable for conversion of the cargo where the importer induced the carrier to make delivery, upon the bonding company's execution of bonds to indemnify the carrier from loss from any and all claims to the goods; especially where the cablegram was not shown or relied upon to obtain the delivery, and no investigation was made by the carrier as to the party entitled to the delivery.

SAME (23, 26)—LIABILITY FOR MISDELIVERY—FOREIGN SHIPMENT—WHAT LAW GOVERNS—STATUTES. Where contracts for the sale of goods and bills of lading, though made in, and subject to the laws of, a foreign country, called for delivery in this state, they are controlled by our uniform bills of lading act, Rem. Comp. Stat., § 3660, making the carrier liable for misdelivery of goods for which a negotiable bill was issued, if it fails to take up and cancel the bill.

SAME (26)—MISDELIVERY—ACTIONS—DEFENSES. Where an importer obtained wrongful delivery of a shipment of goods by induc-

[1]Reported in 212 Pac. 564; 216 Pac. 851.

ing a bonding company to indemnify the carrier, and delivery was immediately made on the security of the bond, and the goods disposed of before the shipper or its assignee learned of the delivery, the assignee's action for conversion of the goods against the consignee, the carrier and the bonding company is not affected by the fact the shipper's assignee, in ignorance of the delivery, more than a month later, issued open time drafts which were accepted by the consignee, and the same did not entitle the consignee to bills of lading not offered or asked for.

SAME (26)—MISDELIVERY—ACTIONS—DEFENSES. The filing of a claim in bankruptcy does not defeat a claimant's prior action against the bankrupt, his surety and a carrier, for goods wrongfully delivered on the security of a surety bond without taking up the bill of lading, where the claim was filed to minimize the damages the codefendants would otherwise suffer through the insolvency of the bankrupt, with a tender to them of subrogation to all claimant's rights under its claim.

SAME (26). A shipper's action for misdelivery of oil imported is not affected by the payment of claims on account of differences in the cost of exchange, and for leakage, which are usual, and which were made before any knowledge of the wrongful delivery.

ON REHEARING.

INDEMNITY (14)—JUDGMENT AND ENFORCEMENT THEREOF. Where, in an action against a carrier and a surety company, which gave a bond to indemnify the carrier on account of claims for goods that the carrier was thereby induced to misdeliver, judgment was against the defendants, the carrier is entitled to be protected by a judgment over against the surety company, where its cross-complaint to that effect was served upon, and not resisted by, the bonding company.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered February 3, 1922, upon findings in favor of the defendants, dismissing an action for conversion, tried to the court. Reversed.

*Shank, Belt & Fairbrook,* and *Peters & Powell,* for appellant.

*Jos. A. McCullough, McClure & McClure, Bausman, Oldham, Bullitt & Eggerman,* and *Chadwick, McMicken, Ramsey & Rupp,* for respondents.

*Kerr, McCord & Ivey* and *Donworth, Todd & Higgins, amici curiae.*

MITCHELL, J.—The plaintiff, the Yokohama Specie Bank, Limited, a corporation, was and is engaged in business at Dairen, Manchuria. The defendant United States Fidelity & Guaranty Company, a corporation, is a bonding and surety company authorized to do business in this state. The defendant Mitsubishi Company owns and operates a line of steamships from Dairen and other points in the Orient to Seattle. The Nisshin Oil Mills, of Dairen, a Japanese corporation, was engaged in business at Dairen, Manchuria, in the manufacture and sale of vegetable oils. Rogers Brown & Company, for several years prior to its failure in 1920, was a corporation engaged in the importing business in Seattle. During several years just preceding the year of the transaction in controversy here, Rogers Brown & Company had imported a large quantity of merchandise purchased from the Nisshin Oil Mills, paid for upon drafts forwarded to Seattle with documents for collection under letters of credit already established from time to time by Rogers Brown & Company.

Early in January, 1920, two contracts, each covering ten thousand cases of soya bean oil, were entered into between the Nisshin Oil Mills as seller and Rogers Brown & Company as purchaser. The contracts were made on the part of the purchaser through its agent, Mr. Ellis, stationed at Dairen, and promptly afterwards confirmed by the house. The contracts were in the common familiar c. i. f. form and provided that payment should be made for the oil by sixty-day sight drafts under letters of credit to be provided for by the purchaser. On January 24, 1920, the steamship "Eastern Crown" operated by the Mitsubishi Company, on which the oil mills had contracted for shipping space, arrived in Dairen. The twenty thousand cases of oil were loaded on the ship January 26, 1920, and on that

date the captain issued two "on board" bills of lading, each covering ten thousand cases of oil. In each bill of lading the Nisshin Oil Mills was named as shipper and the goods were deliverable to its order, "notify Rogers Brown & Company, Seattle." Marine insurance on the goods was procured by the shipper on January 28, 1920. The ship sailed from Dairen on January 29, 1920, and Rogers Brown & Company were advised of it by a cablegram of that date.

It appears that, according to the course of their prior dealings, letters of credit should have been received by the Nisshin Oil Mills from Rogers Brown & Company at least a week prior to the sailing of the ship. No such letters having been received, the shipper, even before the ship left port, urged upon the local representative of Rogers Brown & Company, personally, to see that the Seattle office furnished the letters of credit; and on February 9 the Nisshin Oil Mills wired the Seattle office direct to cable letters of credit for the goods. In the usual course of her voyage the "Eastern Crown" was expected to arrive in Seattle about the 1st of March or within a few days thereafter, and on February 17, 1920, the Nisshin Oil Mills cabled to the Seattle office of Rogers Brown & Company as follows: "Eastern Crown will arrive ahead of documents take immediate delivery and cable credit at once." The cablegram was delivered in Seattle on February 28. The steamer arrived at Seattle on March 2.

Rogers Brown & Company, not having the bills of lading with which to get delivery of the oil from the carrier, procured from the defendant United States Fidelity & Guaranty Company, on March 4, 1920, two bonds, each covering ten thousand cases of oil, whereby the bonding company agreed to furnish to the steamship company bills of lading for the oil within ninety days, or in default thereof, to hold the carrier free

from any and all claims which might be made by any party for the goods. On the back of each of the bonds the surety company made and signed the endorsement, "Deliver to Rogers Brown & Company," as the carrier would not deliver the oil without this specific direction, although the face of the bond showed it was intended that the oil was to be delivered to Rogers Brown & Company.

The steamship company made no investigation in Seattle as to who, if anyone, was entitled to delivery of the oil on the order of the shipper, but relying solely upon the protection afforded by the bonds of the surety company and without which, as testified to by its officer and agent, it would not have delivered the oil, it delivered the oil to Rogers Brown & Company, by whom it was promptly disposed of to its customers. After the cablegram of February 17, down to March 20, 1920, the oil mills, by a cablegram on March 3 to the Seattle office and by personal applications to the purchaser's agent at Dairen, urgently and repeatedly insisted that Rogers Brown & Company establish letters of credit to cover the contracts and shipment. On the 19th or 20th of March, because of a letter from the Seattle office to Mr. Ellis, the agent, it appears that he suggested to the Nisshin Oil Mills that it approach its bank to negotiate the sale of its documents covering the oil, with open sixty-day sight drafts drawn by the Nisshin Oil Mills on Rogers Brown & Company in favor of the bank. The Nisshin Oil Mills, on the 20th of March, sold and delivered to the bank, the plaintiff in this case, all the documents, including the bills of lading properly indorsed by it and attached the two drafts, in consideration of the sum of $231,725 paid by the bank, an amount somewhat less than the face of the commercial account and interest. On March 22, 1920, the Nisshin Oil Mills drew on Rogers Brown & Com-

pany for $7,057.96 on account, consisting of $3,424.51 difference in exchange because of lack of letters of credit, and interest in the sum of $3,633.45 from February 1 to March 20 on $231,725. The draft was paid by Rogers Brown & Company, April 22, 1920. On April 17, the two open sixty-day drafts for $115,862.50 each were presented to and accepted by Rogers Brown & Company at Seattle. On April 19, 1920, Rogers Brown & Company forwarded two claims against the Nisshin Oil Mills in the total sum of $9,711.98 by reason of the leakage of oil after shipment, which were paid by the Nisshin Oil Mills on May 11, 1920. On June 7, 1920, a receiver was appointed for Rogers Brown & Company, and such receiver has continued as such at all times since. The two drafts for $231,725 were not paid on their due date, June 16, nor at all.

It may be mentioned here that, on March 20, 1920, none of these parties residing in Dairen had the slightest knowledge that the oil had already been delivered by the carrier to Rogers Brown & Company at Seattle. It seems that the first one of them to learn of the delivery was Mr. Ellis, who testified that he first learned of it the latter part of May or the 1st of June.

Prior to the commencement of this action, the Nisshin Oil Mills assigned to the plaintiff herein all its claim for damages against the United States Fidelity & Guaranty Company and the Mitsubishi Company.

This action in conversion was commenced on September 21, 1920. By the second amended complaint, upon which trial was had, judgment was demanded against defendants, the United States Fidelity & Guaranty Company and the Mitsubishi Company, and each of them, in the sum of $231,725, together with interest at six per cent per annum from March 4, 1920, because of the conduct of the defendants acting together in arranging for and making wrongful delivery of the mer-

chandise to Rogers Brown & Company on March 4, 1920, they well knowing that the owner had given no order for such delivery.

After the commencement of the action, and on or about November 15, 1920, the plaintiff herein filed with the receiver of Rogers Brown & Company its verified claim in the sum of $231,725, represented by the two negotiable bills of exchange. On or about June 17, 1921, the Fidelity & Guaranty Company filed with the receiver of Rogers Brown & Company its verified claim in the sum of $231,725, reciting therein the pendency of this suit and somewhat of the history of the transaction out of which it grew. This claim was, on November 29, 1921, withdrawn and the receiver authorized to disregard it by the claimant. The claim of the plaintiff herein was allowed by the receiver, who testified at the trial of this case that the matter was being held in abeyance pending the outcome of the present suit.

The defendants, appearing separately, by their amended answers filed in January, 1922, by appropriate allegations put in issue the essential facts alleged by the plaintiff, together with certain affirmative defenses hereinafter referred to that were denied by replies. The action was tried without a jury. It resulted in findings, conclusions and judgment dismissing the action, from which the plaintiff has appealed.

The conclusion of the trial court, orally expressed, was to the effect that the cablegram of February 17, 1920, prior to the sale of the documents to the appellant, from the Nisshin Oil Mills to Rogers Brown & Company authorized the latter to receive the goods upon arrival; that the only risk of the carrier was to deliver to one authorized to receive, and that, since that was actually done in this case, there was no conversion. The findings entered cover this view, together with other contentions made by the respondents.

The proposition of whether Rogers Brown & Company were authorized to receive the goods is by far the most important question in this case. It is the one that directly, and more particularly indirectly, has received the greatest amount of consideration in the elaborate arguments of all the attorneys. Before discussing the facts with reference to this point it may be well to observe that throughout the whole case the respondents, denying the applicability of §14 of the uniform bills of lading act of this state, §3660, Rem. Comp. Stat., contend that, because the bill of lading contracts were made at a place subject to the laws of Japan, and because of a clause in the contract providing therefor, the bills of lading must be construed and governed by the laws of Japan, which, under their proof and the proper rules of statutory construction, is the same as the rule at common law, substantially to the effect that an assignment of a bill of lading is equivalent to the actual delivery of the goods, which, when applied to this case, means that the assignment to plaintiff carried nothing whatever because the goods had already been lawfully delivered to Rogers Brown & Company because of the cablegram of February 17.

If we assume that the contention made by the respondents as to the law is right, it will avail respondents nothing, for, in our opinion, the cablegram referred to was neither an order justifying the carrier to deliver the goods, nor Rogers Brown & Company to receive them. True, at the time the Nisshin Oil Mills sent the message, it was the owner of the goods and of the order bills of lading. The message was, as heretofore stated, "Eastern Crown will arrive ahead documents take immediate delivery and cable credit at once." It was not an order to or on the carrier—it was not addressed to it, nor did it direct or authorize the carrier to do anything. The carrier did not act on

it, it knew nothing of the message. It did not author-
ize Rogers Brown & Company to receive the goods as
the agent of the shipper, for the message exacted pay
for the goods. The shipper, through its manager,
testified, contrary to the findings of the trial court,
that it never was the intention of the shipper to release
the goods until it received pay or letters of credit had
been established for its benefit. Obviously the sender
anticipated, just as happened, that the message would
be delivered prior to the ship's arrival, which, of
course, would be the earliest time at which delivery of
the goods could be had, but as to the credit, it should
be cabled at once. Any other construction would be
wholly at variance with all of the prior dealings be-
tween these parties over a number of years. Letters
of credit had always been exacted and why should
the message be read as meaning that now there was to
be a departure from their customary rule and the
granting of leniency when so large an amount was in-
volved, and that, too, in the face of such unusual cir-
cumstances and exceptional repeated failures or re-
fusals of the purchaser to comply with the terms of its
agreement, sufficient to arouse distrust and suggest the
need of care. The language of the cablegram com-
ports with the idea that the seller was taking care of
his interests. It was nothing more than another dun,
a proposition to yet arrange the matter according to
the terms of their contracts prior to the arrival of the
goods so as to obviate future complications. The con-
duct of Rogers Brown & Company shows that they so
understood it. They didn't attempt to use it. It was
neither exhibited to nor mentioned to either of the
respondents. Rogers Brown & Company proceeded as
though they had never received it, because they knew,
manifestly, that they could not or did not wish to
comply with its terms as they understood them.

But still further, while the bills of lading were issued at a place subject to the laws of Japan and would therefore be interpreted by those laws, regardless of a clause in each of the contracts to that effect, the delivery of the goods was to be made in the state of Washington, and the laws of this state govern in that particular. The delivery could have been made nowhere else, and therefore in that respect the contract was to be performed wholly in this state. Transporting the goods across the seas from Dairen did not constitute performance. "That was merely a means of enabling the company to perform by delivery of the property at its destination." *Pittsburgh C., C. & St. L. R. Co. v. Sheppard*, 56 Ohio St. 68, 46 N. E. 61, 60 Am. St. 732.

The situation here is similar on principle to that in the case of *Lagomarsino v. Pacific Alaska Nav. Co.*, 100 Wash. 105, 170 Pac. 368, where a shipper in California brought an action through an assignee in this state to recover for the loss by fire of goods held by the carrier as such after arrival of the goods in Seattle. In deciding the case in favor of the plaintiff it was said, among other things:

"The final contention is that the shipment originated in California; that the contract of carriage is, therefore, a California contract and governed by the laws of that state (Civil Code, §§ 2086, 2087, 2197) which exempt a marine carrier from loss or injury 'caused by the perils of the sea or fire,' in addition to other exemptions allowed such carriers. It is sufficient to say that, conceding the applicability of a foreign statute to the right of action in this state, such statute was not pleaded or proved. But, even if pleaded, it could have no extraterritorial effect and could not be given force in our courts for the reason that the loss occurred at the point of destination, a point without the jurisdiction of California."

See, also, *Carstens Packing Co. v. Southern Pac. Co.*, 58 Wash. 239, 108 Pac. 613, 27 L. R. A. (N.S.) 975.

So in this case the contracts provide for the delivery of goods in this state, the ultimate important purpose, and they are therefore controlled by our uniform bills of lading act, ch. 159, Laws of 1915, p. 466, especially § 14 thereof, the same being § 3385-14, Rem. 1915 Code, as follows: [Rem. Comp. Stat., § 3660.]

". . . . if a carrier delivers goods for which a negotiable bill had been issued, the negotiation of which would transfer the right to the possession of the goods, and fails to take up and cancel the bill, such carrier shall be liable for failure to deliver the goods to anyone who for value and in good faith purchases such bill, whether such purchaser acquired title to the bill before or after the delivery of the goods by the carrier, and notwithstanding delivery was made to the person entitled thereto."

Because of the open sixty-day drafts forwarded by the bank on or about March 20 and the acceptance thereof by Rogers Brown & Company on April 17, respondents contend that the acceptor was then entitled to the bills of lading, and hence the appellant cannot prevail in this action. A number of authorities are discussed and freely quoted from to sustain that position. What is termed by them to be a leading case on the subject is *National Bank of Commerce of Boston v. Merchants National Bank of Memphis,* 91 U. S. 92. The fundamental question in that case was stated by the court to be ". . . . . whether a bill of lading of merchandise deliverable to order, when attached to a time draft and forwarded with the draft to an agent for collection, without any special instructions, may be surrendered to the drawee on his acceptance of the draft, or whether the agent's duty is to hold the bill of lading after the acceptance for the payment." It having been proven in that case that there were no special instructions given to the agent in transmitting the papers, it was held that the agent,

who was the defendant in the suit, was not liable for surrendering the bill of lading upon procuring the acceptance of the draft. It was said, in effect, that it seems to be a natural inference from a time draft, accompanied by a bill of lading indorsed in blank, that the merchandise specified in the bill was sold on credit, to be paid for by the accepted draft, or that the draft is a demand for an advance on the shipment, or that the transaction is a consignment to be sold by the drawee on account of the shipper. The transaction was held to be equivalent to a sale in consideration of a promissory note; that is a sale on credit. The court said:

"The reason for this is, that very often, and with merchants generally, the thing purchased is needed to provide means for the deferred payment of the price."

In the case at bar, however, there is no room or occasion to indulge in inferences as to the terms of the sale of the goods, for, by the written contract between the parties, the purchaser had already agreed to supply letters of credit to provide for the payment. Nor does the reason given by the court for the rule have any application to the situation here, because at the time these drafts were accepted, the drawee had no need whatever for the bills of lading in order to get possession of the goods to provide means for paying for them. Rogers Brown & Company, in consideration of $231 paid by it, had theretofore furnished bonds upon the faith of which it had received the goods forty-four days prior to the acceptance of the drafts, by the terms of which bonds it had established a credit with the respondent steamship company which assumed the full risk of a wrongful delivery because of the bonds, by which credit Rogers Brown & Company had ninety days from the date it received the goods in which to pay for them.

As a matter of fact, on the very date the drafts were accepted, Rogers Brown & Company had already disposed of the oil and used the proceeds in the payment of other obligations, as shown by its letter to its agent in Dairen written on that date, as follows:

"As we were able to obtain possession of the oil as soon as it arrived, by putting up bank guarantees, we immediately applied this oil against some of our current sales contract, and got our money out of it, thus obtaining the use of the funds immediately. We figured that, after the receipt of our cable, the drafts would be at least 30 days in transit and that together with sixty days usage would give us the use of the money for at least ninety days. As a matter of fact, in this particular instance, we shall have had the use of the proceeds of this oil, for nearly one hundred and twenty days. In addition to this we shall have saved bank charges, for opening credits of one-fourth of one per cent (¼ of 1%), and also the charges incident to cabling credits to the Orient, so that we really do not lose anything on the transaction at all though we realize Nisshin's position, and will always endeavor to place credits whenever possible. It is not necessary for you, of course, to explain the foregoing to Nisshin, but we feel sure that after the experience which he and other Japanese importers must have had lately, in connection with securing credits for imports, that he will be able to appreciate our position, when we are up against this similar conditions."

At the time Rogers Brown & Company accepted the drafts, it did not ask for the bills of lading, and manifestly did not think, or have any reason to believe, they would be delivered. They were in no sense needed to protect it against some possible future negotiation of the documents by the holder thereof, because, at the time it accepted the drafts, it had already received the goods and realized on them. And, since appellant's agent in presenting the drafts did not offer to surrender the bills of lading, it must be presumed,

in the absence of proof, that it was obeying instruc-
tions not to deliver them. None of the authorities
cited by counsel, as we read them, are applicable to
this situation. This contention on the part of the re-
spondents is without merit.

Each of the respondents, by an affirmative answer,
contends that the appellant, by presenting a claim to
the receiver of Rogers Brown & Company, has de-
feated its right to recover in this action. That conduct,
it is argued, was not an election of remedies, but
amounted to a ratification of the act by which the goods
were delivered by the steamship company, or estoppel
to deny the lawfulness of that delivery. The proof,
however, shows, without contradiction, that in present-
ing the claim to the receiver the bank did so for the
benefit of those it had already sued in conversion, so
as to minimize the damages they would otherwise suf-
fer because of the insolvency of Rogers Brown & Com-
pany. That was the intention rather than ratification
and seems to have been well known to the receiver,
who testified that, with the consent of the claimant and
the court, he was holding the matter in abeyance until
the outcome of the present suit, it appearing that a
substantial dividend had already been declared in the
receivership matter, none of which has been paid to or
called for by the appellant. In the reply of the appel-
lant to this affirmative defense it offers and tenders to
the respondents the right to be subrogated to all the
rights of the appellant under its claim in the re-
ceivership matter upon appellant's receiving its pay
according to its demands in the present action. We
think that course and position is fair in law and equity
and does not defeat appellant's rights in this action.

Though not mentioned specifically as defenses, some
argument has been made as to the effect of the pay-
ment by Rogers Brown & Company to the Nisshin Oil

Mills of the amount claimed for the difference in the cost of exchange and interest, and also of the amount paid by the Nisshin Oil Mills to Rogers Brown & Company on account of leakage after the oil was shipped. Those things, however, are usual, it appears, in such transactions, and can in no manner interfere with appellant's cause of action, because they took place prior to any knowledge on the part of either the Nisshin Oil Mills or the bank of the wrongful delivery which is the foundation of this action, and after the Nisshin Oil Mills had sold and delivered the bills of lading to the bank.

In the answer to the Mitsubishi Company there is a cross-complaint against the United States Fidelity & Guaranty Company to recover judgment over in case it is compelled to pay the appellant in this action. It does not appear that the pleading was served on the bonding company, no issue was made with reference to it, nor did the trial court pass on it. It seems to have been later ignored and we express no opinion with regard thereto.

Upon consideration of the whole record, we are satisfied the appellant is entitled to recover judgment against both respondents in the amount demanded in its second amended complaint.

The judgment is reversed, and the cause remanded with instructions to enter judgment accordingly.

PARKER, HOLCOMB, MACKINTOSH, and BRIDGES, JJ., concur.

### ON REHEARING.

[*En Banc.* July 10, 1923.]

PER CURIAM.—After the opinion of a Department of this court in this case was filed, both respondents, the United States Fidelity & Guaranty Company and Baron H. Iwasaki and Baron K. Iwasaki, a partner-

ship known as the Mitsubishi Company, filed their separate petitions for a rehearing. Both insisted on an affirmance of the judgment appealed from, while the petition of the Mitsubishi Company demanded in the alternative a judgment over against the United States Fidelity & Guaranty Company for any amount it may be compelled to pay on any judgment against it in favor of the bank. The case has been reargued and considered *En Banc.*

Concerning the rights of the Yokohama Specie Bank, a majority of the court still adhere to the Department opinion, and for the reasons therein stated, the judgment is reversed with directions to the trial court to enter judgment for the appellant as stated in that opinion.

Concerning the rights of the Mitsubishi Company to be protected by a judgment over against the United States Fidelity & Guaranty Company, because of the bond made and delivered by the bonding company to the Mitsubishi Company for all that the Mitsubishi Company may have to pay the bank, the record shows that, on the appeal as the case was presented to the Department, the Mitsubishi Company joined the bonding company for an affirmance of the judgment that the appellant's case be dismissed. As an alternative protection to the Mitsubishi Company it is now made to appear, as the case is presented to the whole court, by written admission and stipulation of the attorneys for the bonding company presented with the Mitsubishi Company's petition for a rehearing, that the cross-complaint of the Mitsubishi Company for a judgment over against the bonding company was served on the bonding company and filed in the cause prior to the trial. The cross-complaint appears not to have been resisted by the bonding company. It follows, there-

fore, that the statements in the Departmental opinion that it does not appear that the cross-complaint was served on the bonding company and that it seemed to have been later ignored, must be and they are hereby corrected, and that in the judgment to be entered by the trial court there shall be a provision that the Mitsubishi Company have and recover of and from the bonding company any and all the Mitsubishi Company shall be compelled to pay on the judgment in favor of the bank.