**LOUIS–DREYFUS et al. v. PATERSON STEAMSHIPS, Limited.**

**No. 327.**

Circuit Court of Appeals, Second Circuit.

July 21, 1930.

D. Roger Englar and Bigham, Englar, Jones & Houston, all of New York City, Burke & Desmond, of Buffalo, N. Y., Henry N. Longley, of New York City, Thomas C. Burke, of Buffalo, N. Y. and Ezra G. Benedict Fox, of New York City, for appellants.

Theodore C. Robinson and Holding, Duncan & Leckie, all of Cleveland, Ohio, for appellee.

Before L. HAND, CHASE, and MACK, Circuit Judges.

L. HAND, Circuit Judge.

The libellants at Duluth shipped a parcel of wheat upon two ships of the respondent and received in exchange bills of lading, Duluth to Montreal, "with transshipment at Port Colbourne, Ontario." These contained an exception for "dangers of navigation, fire and collision," but nothing further which is here relevant. The respondent exercised its right of reshipment, unladed the wheat at Port Colbourne, stored it in an elevator, and reladed thirty-five thousand bushels in another ship, the Advance, belonging to one Webb, chartered by the respondent's agent, the Hall Shipping Company, for that purpose. This ship safely carried her cargo until she reached the entrance to the Cornwall Canal in the St. Lawrence River, where she took the ground, stove in her bottom and sank. The suit is for the resulting damage to the wheat.

The respondent defended on the ground that the strand, not being due to any fault in management, was a danger of navigation. Failing this, it relied upon the Harter Act (46 USCA §§ 190–195) and the Canadian Water-Carriage of Goods Act (9–10 Edward VII, Chap. 81), which covers among other ships those "carrying goods from any port in

Canada to any other port in Canada" (section 3). It requires every bill of lading "relating to the carriage of goods from any place in Canada to any place outside Canada" to recite that the shipment is subject to the act (section 5), and, like section three of the Harter Act (46 USCA § 192) provides that "if the owner of any ship transporting merchandise or property from any port in Canada exercises due diligence to make the ship in all respects seaworthy and properly manned, equipped and supplied, neither the ship, nor the owner, agent or charterer" shall be liable "for faults or errors in navigation or in the management of the ship" (section 6). The respondent tried to prove that the Advance was seaworthy, and was therefore within both statutes. Finally it argued that it was not in any event a through carrier, and that its liability therefore ended upon delivery of the wheat on board the Advance at Port Colbourne.

▊▊▊ To begin with the last defense, we think it clear that the respondent was a through carrier. It relies upon those cases in which one railway, connecting with another at its terminus, gives a through bill of lading, sometimes with, sometimes without, stipulation that liability shall cease at delivery. In such a case the receiving carrier is generally not liable beyond its own line. Myrick v. Michigan Central R. Co., 107 U. S. 102, 1 S. Ct. 425, 27 L. Ed. 325; Penn. R. Co. v. Jones, 155 U. S. 333, 15 S. Ct. 136, 39 L. Ed. 176. The case at bar is not like that; it is true that the two ships which first lifted the wheat could not go through the Welland Canal, and that transshipment was inevitable from the outset, but it did not follow that the respondent would not carry all the wheat to Montreal in its own ships; and so indeed it did except about 55,000, out of 300,000, bushels. Four out of the six vessels used belonged to it, and it chartered the two others, of which the Advance was one, apparently for its convenience. It was liable for her miscarriage, quite as though it had owned her [Colton v. N. Y. & Cuba Mail S. S. Co., 27 F.(2d) 671 (C. C. A. 2)]; she was its selection, the means which it used to perform its obligation.

The parties are indeed at odds as to whether the respondent really did charter the Advance. On the issue of through carriage the libellants insist that the respondent is to be charged because of her; on that arising under the Canadian act (section 6), they say that the respondent was not a charterer. The respondent takes the reverse position in each

issue. We decide as to both that the respondent was a charterer. The ship was, as we have said, chartered by the Hall Shipping Company, a corporation which had secured the original space for the libellants, but which quite generally acted for the respondent in the details of its business. The evidence is too plain for question that it was for the respondent that it fixed the Advance to complete the carriage, and the respondent became as much a principal, though undisclosed, as though its own officers had struck the bargain. The fact that the libellants at the outset paid a commission to the Hall Company for securing the space at Duluth, might, if it stood alone, justify us in concluding that it was the libellants' agent, but the answer, the interrogatories, and the testimony show beyond shadow of question that this was not the case.

▊▊▊ However, the respondent says that even though a through carrier, it was not a common carrier as to the Advance, whose cargo occupied the full reach of her holds. The issue is important primarily because upon it depends the burden of proof to show negligence in navigation; and we are content for argument to assume that she was a private carrier, even though the respondent was generally engaged in the business of common carriage. We think that the libellants have carried the burden. It is extremely unlikely that the Advance should have taken the ground where and when she did, unless the local pilot then in charge had been negligent. At the trial he was not called, and the master, who was with him on the bridge, had no explanation except somewhat faintly to suggest that the ship had been carried off to port by the river currents. He had already cautioned the pilot that he was keeping up too far to the left, and when the ship lost way, she sagged over to port, and her bottom on that side was impaled upon some rock or lost anchor, which stove a small hole through her planks. We cannot hold it good navigation to let a ship go ashore which in calm water is passing through a well-known channel, subject only to those currents which are, or should be, known to the navigator. To be sure, such things can happen; there are twists of current, like those of the sea, against which prudence will not defend, but in the case at bar their existence rests merely in supposition. We know that the ship was out of position, that her loss of way was to be expected, that ships commonly pass through the channel without injury, that nothing unusual here interfered with naviga-

tion. This makes a situation from which we must infer fault unless good proof exculpates the navigator. There is none, and indeed the master remained in doubt even at the trial as to whether to blame the pilot. We cannot therefore agree with the finding of the District Judge that the strand was a "danger of navigation"; on the contrary, we think that the libellants have shown negligence.

We shall assume arguendo that section three of the Harter Act (46 USCA § 192) did not cover the case; verbally it only includes "vessels transporting merchandise or property to or from any port in the United States." The point is not raised in any event, since there is no proof of the seaworthiness of the vessels clearing from Duluth, which lifted the wheat. If the Advance is to be identified with these, the substitution being ignored, at least all three ships concerned must be shown to be seaworthy. Quite other considerations control as to section six of the Canadian act. We pass the point that the bills of lading did not incorporate that statute; section five only requires such a recital in case of a shipment from a Canadian, to an outside, port, and apparently even in those cases it is only directory. Verbally at least section six covered the situation; the Advance was "transporting goods" "from" a Canadian port, and the respondent was the charterer, as we have said.

■ The important question is whether we should look to Canadian law at all. Here is a contract of carriage, made in Minnesota without any relevant exceptions, to be performed partly in the United States and partly in Canada; the carrier fails in performing that part of it which is to take place in Canada; he does not safely transport the grain from the entrance of the canal to Montreal. The law of the place of that performance excuses him for those faults in navigation which have caused the loss. Does that law control? Liverpool, etc., Co. v. Phenix Ins. Co., 129 U. S. 397, 9 S. Ct. 469, 32 L. Ed. 788, decided that the validity of a provision in a contract of carriage, limiting the carrier's common-law duty, was to be determined by the law of the place where the contract was made, and this is well-settled law (section 366, Tentative Restatement No. 4, Conflict of Laws; American Law Institute), even when the parties expressly stipulate that all questions shall be decided according to some foreign law, which would require a different result (Oceanic Steam Nav. Co. v. Corcoran (C. C. A. 2) 9 F.(2d) 724,

57 A. L. R. 163). It is of course only an instance of the usual rule that the law of the place where promises are made determines whether they create a contract (section 353, Op. Cit.); that law alone attaches any legal consequences to acts within its territory.

On the other hand, it is always said that as to matters of performance the law of the place of performance controls (Andrews v. Pond, 13 Pet. 65, 78, 10 L. Ed. 61; Scudder v. Union National Bank, 91 U. S. 408, 23 L. Ed. 245; Pritchard v. Norton, 106 U. S. 124, 1 S. Ct. 102, 27 L. Ed. 104; Hall v. Cordell, 142 U. S. 116, 12 S. Ct. 154, 35 L. Ed. 956), though in application the boundaries of this doctrine are not easy to find, as the last two cases cited illustrate very well. An exchange of mutual promises, or whatever other acts may create a contract for future performance, do not put the obligor under any immediate constraint, except so far as the doctrine of anticipatory breach demands. A present obligation arises only in the sense that it is then determined that when the time for performance arrives, his conduct shall not be open to his choice. For the present nothing is required of him; he can commit no fault and incur no liability. When the time comes for him to perform, if he fails, the law requires him to give the equivalent of the neglected performance; that compulsion is the sanction imposed by the state and the measure of the obligation. The default must indeed be at the place of performance, but the promisor need not himself be there, nor may he there have any property to respond. In such cases it is impossible to say that any liability arises under the law of that place; yet it would be exceedingly inconvenient to hold that it depended upon the law of the place where the promisor chanced to be at the time of performance, especially if such a doctrine were extended to all places where he has any property. In the interest of certainty and uniformity there must be some definite place fixed whose law shall control, wherever the suit arises. Whether the place of performance is chosen because of the likelihood that the obligor will be there present at the time of performance, or—what is nearly the same thing—because the agreement presupposes that he shall be, is not important. All we need say here is that the same law which determines what liabilities shall arise upon nonperformance, must determine any excuses for nonperformance, which are no more than exceptions to those liabilities.

The authorities in general support this view; as, for example, in the case of a mor-

atorium (Rouquette v. Overmann, L. R. 10 Q. B. 525); of payment upon a forged indorsement (Kessler v. Armstrong Cork Co., 158 F. 744 (C. C. A. 2); Belestin v. First National Bank, 177 Mo. App. 300, 164 N. Y. S. 160); of the delivery of a note as payment (Tarbox v. Childs, 165 Mass. 408, 43 N. E. 124; Gilman v. Stevens, 63 N. H. 342, 1 A. 202, on the facts, though not on the reasoning); of payment in one currency or another (Anonymous, 1 Brown C. C. 376; Benners v. Clemens, 58 Pa. 24); of who is the proper payee (Graham v. First Nat. Bank, 84 N. Y. 393, 38 Am. Rep. 528), or consignee (Yokohama Specie Bank v. U. S. Fidelity & Guaranty Co., 123 Wash. 387, 212 P. 564, 216 P. 851); of the time of grace on commercial paper (Bowen v. Newell, 13 N. Y. 290, 64 Am. Dec. 550). In the case at bar, the Canadian law says that performance of the contract of carriage, as respects navigation, shall be excused if the owner uses due care to examine his ship and make her fit for her voyage, to man and victual her and the like. The conduct so specified is thus made an excuse for his failure to carry the goods safely to their destination as he has promised to do. That is exactly like any other excuse for such failure; delay is as much a breach as default; payment not specified is no payment; delivery to another, no delivery.

It is indeed possible to say that any excuse for performance is a condition upon the undertaking, written into, and so a part of, the original promise. Courts which have insisted that the parties must be found in some way to have selected foreign law to control their rights, have so reasoned as to the law of the place of performance. We think that the imputation of any such intent is a fiction. It is quite true that civilized law will generally make part of their obligations whatever the parties choose to incorporate into their promises, foreign law like anything else. It is also true that if the parties have specified that performance shall be subject to certain excuses, the law of the place of performance will accept those excuses; that is no more than saying that the contract defined the performance. But the parties cannot select the law which shall control, except as it becomes a term in the agreement, like the by-laws of a private association. When they have said nothing, as here, the local law determines what shall excuse performance ex proprio vigore; the parties do nothing about it. An American contract carries with it none of the immunity of the sovereign which created it; Canadian law reaches it and Canadian contracts indifferently.

The English cases dealing with the Harter Act (Dobell & Co. v. S. S. Rossmore Co., [1895] 2 Q. B. 408, [C. A.]; Rowson v. Atlantic Transport Co., [1903] 2 K. B. 666 [C. A.]), are not contrary. So far as written into the documents the act became a part of the contract, but no further. In no case did it appear that the default in performance took place in the United States, where alone section three of the Harter Act (46 USCA § 192) was in force. We have no reason to suppose that in such an event an English court would refuse to accept the excuse. Nor would it make any difference though we ourselves enforced the act outside the United States in cases where it was not incorporated in the shipping documents. Whatever might be thought of that as law, if we did it, it would not affect the propriety of our recognizing the Canadian act here. Were it not for section three of our own Harter Act (46 USCA § 192), we might indeed have to consider whether such an excuse for performance would so far answer our ideas of sound policy that we should accept the Canadian statute. But that statute was apparently drafted closely to conform to our own, and we can of course have no compunctions in taking it as the model of those liabilities which we will recognize. For this reason a provision in the bill of lading incorporating the Canadian act by reference or at large, would not fall under the ban of Liverpool, etc., Co. v. Phenix Insurance Co., or The Kensington, 183 U. S. 263, 22 S. Ct. 102, 46 L. Ed. 190. On the other hand, the bill of lading might have expressly repudiated both the Harter Act and its Canadian progeny, and fixed the liability of the carrier as at common law or even as that of an unconditional insurer. We will not say that either statute would have prevented the enforcement of those stipulations, but this would be because under Canadian law the stipulated performance would then have been so modified that the statute did not excuse it, and because that result did not offend our local policy. When the parties have not so expressed themselves performance and excuses for nonperformance depend upon Canadian law. We conclude that if the Advance was in fact seaworthy, the respondent was excused by virtue of the Canadian statute, and in that event we need not consider the issue of due diligence.

She was an old ship, built in 1884, and built over in 1900; how far, does not appear.

She had lain in the mud during the winter of 1926–27; in the following spring Webb bought her for three thousand dollars, spent about six hundred dollars on her, and used her on three summer voyages on the Lakes. She had been pretty thoroughly examined in June, though not in dry dock, and got a classification of ninety in the American Shipping Bureau, this being the lowest for dry cargoes. Again examined in August to secure a grain classification, she was certified for three months, and was sunk while sailing under this certificate. At once thereafter she went to dry dock, where for the first time the outside of her planking below the water line could be seen. This proved worn and broomed, but save for the broken planks, was not renewed and without substantial repairs her classification was extended till June, 1928. For the next season considerable repair was made upon her.

The planking had originally been five inches thick and was worn down a little over an inch in places; at one spot it had been gouged out over two inches, but in general enough thickness remained to resist the ordinary shocks of her service. At least there was plenty of testimony on which the District Judge might so find, as he did. The test of seaworthiness is obviously elastic, and it is idle for us to speculate on the written evidence, whatever we might have thought had we seen all the witnesses. Perhaps it is especially true of opinion evidence that the personal equation counts; a pragmatic, self-confident person may make an admirable showing in a record, who, if one saw him in the flesh, would appear shallow, pretentious and unreliable. We can do little more than say that such an old boat as the Advance may well be within the limits of safety for work of this sort, though her planks are worn as much as these were. Many a steamer goes about her business for over forty years, if she be kept up to it. We cannot suppose that the Canadian inspectors, having her on dry dock after the accident, would have extended her grain rating without further repairs, if she had not been reasonably fit.

■ The libellants have, however, raised a defect in construction which calls for new proof that we cannot satisfactorily take ourselves. Apparently the Advance had five pumps; three working direct from the boiler, and two from the engine. Those fed by the boiler had no suctions to the cargo hold, which was ordinarily expected to drain into the engine compartment by a valve in the bulkhead. This meant that, if the valve was closed, the cargo hold could be pumped only from the engine room, and that, if this was flooded, it could not be cleared at all. The only evidence in the record is that this made the ship unseaworthy, and while we are not satisfied that this conclusion must inevitably be true, we see no way to disregard the undisputed testimony of two qualified witnesses. The issue was apparently allowed to go by default, and we must send back the case to determine whether the arrangement and condition of the pumps, bulkheads and valves were such as to make the ship seaworthy. On the new trial no evidence is to be received which is not pertinent to this, and the respondent has the burden upon it.

■ The libellants also laid a cause of action in trover, charging the respondent with conversion in mixing their grain with that of others in the elevators at Colbourne. This, if a tort, was apparently committed on the land at the moment when the grain, being sucked out of the original ships, was drawn into the elevator. It was not within the jurisdiction of a court of admiralty. If however the jurisdiction of the District Court is to be supported on the ground of diverse citizenship which appears in the pleadings (U. S. ex rel. Pressprich & Son Co. v. James W. Elwell & Co., 250 F. 939 [C. C. A. 2]), the case fails on the merits. Just how grain is to be transshipped without the use of an elevator the libellants do not suggest. Apparently each transshipping vessel was to be brought alongside and filled out of the two original ones. Nobody could seriously have expected any such thing in modern times and in a port where there was a government elevator. The libellants consented to ordinary methods, and there was no conversion. Cushing v. Breed, 14 Allen (Mass.) 376, 92 Am. Dec. 777; Arthur v. Chicago, etc., Ry. Co., 61 Iowa, 648, 17 N. W. 24. It is suggested that their wheat was mixed in one bin with other grades, but the proof is to the contrary, or at least is too equivocal to sustain an issue on which they have the burden. Apparently the wheat was not mixed at all, but put into empty bins; if not, at least the libellants have not proved the mixing.

Decree reversed; cause remanded to be reheard upon the issue above mentioned.