## Case No. 4,178.

### DUNN v. The YOUNG AMERICA.

[37 Leg. Int. 30;[1] 14 Phila. 532.]

District Court, E. D. Pennsylvania. Jan. 9, 1879.

H. G. Ward, for libellant.

Henry Flanders, for respondent.

BUTLER, District Judge. The owners of the steam tug Young America, George W. Pride and others, through their agent, the master of the Pioneer, contracted with the libellant to tow his ship (1,311 tons burden, and 132 feet long), the Lord Cairns, from the sea, and dock her at Philadelphia. She was brought up by the Pioneer, and left at anchor, opposite Greenwich, on the 12th of April, 1879. The wind was fresh from the northwest, and the tide flood. The ship was in ballast-trim, and lay across the stream, with the Norwegian bark Zorida, a short distance above. Her master called at the office of Mr. Pride, and requested to have his ship taken in. The Pioneer was absent, and the Young America was despatched on the service. The libellant seems to have entertained some doubt of the capacity of this boat for the work; he referred to the wind, and, as he was leaving (and probably before), requested the aid of a second boat. Mr. Pride called Captain Taylor, and inquired whether he could perform the service with the Young America, and was answered that he "thought" he could. When the boat reached the ship, a hawser was taken out on the port bow, the anchor raised, and the tug started forward. Very soon she "slacked up," and the ship drifted sternways toward the Zorida. Whether she "slacked up" more than once the witnesses do not agree. The weight of the evidence is that she did so twice. On the first occasion her anchors, which were dropped, held her off the bark. On the second occasion, she struck the bark, and sustained the injury for which she now sues.

Is the respondent liable? It was the duty of Mr. Pride and his co-contractors to furnish a tug fully competent to perform the service which they had undertaken, with safety;

[1] [Reprinted by permission.]

and, if one was not sufficient, to add another. The responsibility was on them to determine the amount of force needed, and to perform the service with the care and skill required by the circumstances. They are not common carriers, and are not therefore insurers. The libellant must show failure on their part, either as respects the boat furnished, or the management of it. He charges failure in both. Whether the boat was sufficient—in view of the circumstances existing at the time—is open to doubt. There is a good deal of testimony bearing on the question. The witnesses called by the respondent (most of them employés of Mr. Pride) say she was. Her action on the occasion, as well as the answer of her captain, when appealed to by Mr. Pride (before starting out), might, I think, justify a doubt; and the intelligent gentleman, Captain Gallagher, consulted on this point, as assessor, says (from his personal knowledge, as well as the respondent's description of her) that she was not sufficient.

As respects her management I think the case is free from doubt. She "slacked up" and lost control of the ship twice, after starting. It is quite clear that had she not done so the second time, the accident would not have occurred. On the first occasion collision was avoided by means of the ship's anchors. Might it have been avoided on the second by the same means? If it might, the libellant cannot recover. The several witnesses from the ship say the anchors were dropped immediately on the boat slacking up, on this occasion, as they had been on the former, but that the Zorida was now too close to be thus avoided, while those from the boat testify that the ship's anchors were not let go until after she struck. I feel no hesitation in accepting the statement of the libellant's witnesses respecting this point. They are much more likely to know what was done on the ship, than those on the boat are. Some of them say they saw the anchors let down, and others that they not only saw this, but themselves let them down. The inferences from surrounding circumstances all support this statement. The safety of the ship demanded such action; a seaman would resort to it, under the circumstances, instinctively; and the evidence shows that the master was on the alert. When at Mr. Pride's office he manifested anxiety respecting the movement of his ship, and testifies that he was "all over" the vessel as it moved. He had, just before, resorted to this means of saving his ship from similar danger. I can entertain no doubt that the anchors were used on the second occasion, as they had been on the first.

Thus we are brought to the question: Was the tug justified in "slacking up," on the second occasion, under the circumstances then existing? The respondent says she was, for two reasons: First, that he was commanded to do so, from the ship; and, second, that the hawser was fouled with the martingale,

and likely to break it. Unless he has proved one or the other of these allegations, he must be held responsible for the accident. The first is a question of fact, purely; and the weight of the testimony is against the respondent. The witnesses from the ship say, not only that he was not ordered to "slack up," but on the contrary was directed to "go ahead," both the captain and the mate saying they so shouted, and telegraphed with their hands, when they saw he was stopping, and others that they were by, and heard it. One of the respondent's witnesses testifies to the same effect. And this statement is reasonable and probable. No good cause can be suggested why those on board the ship should desire the tug stopped. If the hawser was fouled, endangering the martingale, it could be righted (as the respondent has clearly shown) from the ship, without interfering with the tug. But the testimony shows that the martingale was in no danger. There was therefore no occasion to interfere with the movements of the tug, while, on the other hand, strong reasons existed for desiring her to go forward, and avoid the danger which must otherwise be encountered.

The remaining allegation involves a question of fact,—was the hawser fouled? and also one of nautical skill and experience,—supposing the hawser to be fouled (as asserted), did this justify the tug in stopping when and where she did? In the view I entertain of the second question, the first becomes unimportant. That the duty was on the ship to keep the hawser clear, as Mr. Pride and other witnesses for the respondent state, and thus protect its martingale, may be granted. If she failed in this, and sustained injury, she must bear the consequences without complaint. She could best see and estimate the danger arising from such cause, and was able to remove it without aid from the tug. If she did not see and remove it, and the martingale was broken, and loss sustained thereby, she must bear it. No responsibility would attach to the tug under the circumstances. Her duty was to go forward, regardless of such danger to the martingale, unless ordered to do otherwise. It follows that the respondent was not justified in stopping when he did, for the cause stated; and especially was he not, in view of the certain danger to which the ship must necessarily be subjected thereby, in consequence of the Zorida's proximity and the direction of the tide. The accident was the natural and inevitable consequence of this mistake, which proper intelligence and proper care would have avoided. (This conclusion has the support of the assessor's judgment, as will be seen by reference to his answers filed herewith.) Whether, therefore, the boat was sufficient for the service on which she was sent, or not, the manner in which she was handled, and the service performed, require that the respondent shall be held accountable for the loss.