## THE E. T. WILLIAMS.

(District Court, S. D. New York. December 1, 1903.)

1. TOWAGE—INSUFFICIENT POWER OF TUG—LIABILITY FOR LOSS OF TOW.

A tug which undertakes a towage service impliedly represents itself to have sufficient power to perform such service under ordinary conditions; and a tug which took two scows to the dumping grounds off New York, but was unable for want of sufficient power to bring them back against adverse winds after they were dumped, whereby one was lost and the owner put to expense in rescuing the other, was in fault, and is liable for the resulting loss, where the weather and sea conditions were no worse than should reasonably have been anticipated when the trip was commenced.

In Admiralty. Suit against tug to recover for loss and damage to tow.

James J. Macklin, for libellants.
John F. Foley, for claimant.

ADAMS, District Judge. The libellants Booth, Dailey and Ivins were the owners of Barney Dumper Scows Nos. 8 and 9, and the other libellants were the members of the crew of No. 9, who lost some personal effects. The scows were loaded with garbage. The wooden tug E. T. Williams took them in tow in New York, on the 7th of February, 1902, for the purpose of dumping them at sea. At first they were towed alongside but before they left the upper bay they were put on hawsers tandem, the first scow, No. 8, was then about 100 fathoms astern of the tug and No. 9 was tailed on to No. 8, about 70 fathoms away. There was a wind of some force then blowing from about the west or northwest.

When the tow was finally made up, it was after midnight. The tide was ebb. The voyage to sea then commenced, the master of the tug being in charge. About 2 o'clock on the morning of the 8th, the master went to bed and turned the command over to the mate, who was a licensed pilot. He had come on deck at 12 o'clock, but did not then take charge, as the master remained to pilot the tow through the East Channel. The tow was in charge of the mate from about 2 o'clock until about 7 o'clock in the morning. About 3:20 A. M. the Sandy Hook Lightship was reached and shortly afterwards, 3:40, it is said, the loads were dumped outside of the lightship. After the dumping and the turning of the tow towards New York, the tug was unable to hold the dumpers and the tow drifted seaward. The mate testified that after dumping the loads, the tug, for a short time, made some headway homeward but whether there was any material progress seems doubtful. About 2 o'clock, the hawser leading from No. 8 to the tug parted, near the bitts of the tug. Subsequently the crews of the scows, at the instance of the master of the tug, jumped overboard and were picked up by the tug. Before those on No. 9 left her, the hawsers between the dumpers were cut by the men on No. 9, under orders from the master of the tug. After the men were rescued, the Williams started for New York and met on the way the iron tug Ivins, of about the same size as the Williams, which was then bound out under orders to go to the assistance of the Williams, news of the plight of the latter having reached New York. The Ivins got to the lightship about half past one and, inquiring for the tow, was informed that when last seen, it bore about east southeast. She proceeded in that direction and passing the Williams, well out to sea and making bad weather, was informed by her master, in declining assistance for his tug, that she could weather the prevailing storm, which she did. The Ivins came to the dumpers about 25 or 30 miles east southeast of the lightship and went alongside of No. 8. The dumpers were then drifting seaward at the rate of about 6 miles per hour. They were lying about 200 feet from each other. The men on the Ivins made fast to No. 8, supposing that they were thus securing both of them. When, however, they discovered that they only had one, they proceeded with that, and delivered it safely in New York. The service of the Ivins was made the basis of a salvage claim, which is a part of the damages suffered by the libellants.

The Government weather records, taken from observations made

in New York, at an altitude of between 350 and 400 feet, show that the velocity of the wind was as follows:

February 7th.
   From 2 to 3 o'clock P. M., 34 miles.
     "  3 to 4 o'clock P. M., 37 miles.
     "  4 to 5 o'clock P. M., 27 miles.
     "  5 to 6 o'clock P. M., 29 miles.
     "  6 to 7 o'clock P. M., 29 miles.
     "  7 to 8 o'clock P. M., 28 miles.
     "  8 to 9 o'clock P. M., 29 miles.
     "  9 to 10 o'clock P. M., 32 miles.
     "  10 to 11 o'clock P. M., 31 miles.
     "  11 to 12 o'clock P. M., 25 miles.
February 8th.
   From 12 to 1 o'clock A. M., 27 miles.
     "  1 to 2 o'clock A. M., 33 miles.
     "  2 to 3 o'clock A. M., 29 miles.
     "  3 to 4 o'clock A. M., 29 miles.
     "  4 to 5 o'clock A. M., 26 miles.
     "  5 to 6 o'clock A. M., 23 miles.
     "  6 to 7 o'clock A. M., 27 miles.
     "  7 to 8 o'clock A. M., 24 miles.
     "  8 to 9 o'clock A. M., 24 miles.
     "  9 to 10 o'clock A. M., 38 miles.
     "  10 to 11 o'clock A. M., 42 miles.
     "  11 to 12 o'clock A. M., 43 miles.
     "  12 to 1 o'clock P. M., 46 miles.
     "  1 to 2 o'clock P. M., 44 miles.
     "  2 to 3 o'clock P. M., 43 miles.

Beyond the estimates of some of the witnesses, which were colored by their interests, there is nothing to show that the wind was any stronger at sea than it was in New York, some 16 nautical miles away in a direct line. Of course, the wind was felt more as the tows got beyond the protection of the land and were exposed to its full force.

A large number of tows went out that night and dumped and returned safely. It is probable that some of them did not go quite as far as the Williams and tow but it appears that one or more did. It is uncertain just how far the Williams did go to dump her scows. Her mate and the men on the scows say that she went to the regulation dumping grounds, 5 miles from the lightship, but the master of the Hudson, who took two dumpers, similar to Nos. 8 and 9, about a mile beyond the lightship and dumped them, says that the Williams dumped where the Hudson did. The mate of the Williams says that at 3 :20, he whistled to the lightship and at 3 :40, whistled to the scows to dump. Assuming the correctness of these figures, it is not likely that the tow could have gone 5 miles in 20 minutes, even with the favoring wind. The tide by this time had changed to flood and such current as prevailed was probably adverse to progress seaward. Up to the time of dumping, which act increased the freeboard of the scows several feet, there was not very much of them above water for the wind to have effect upon, but after the cargoes were discharged, a considerably larger surface was exposed and they became difficult to tow, or indeed to hold against the wind, with a tug.

of limited power. There was no material change in the force of the wind for several hours after the tow passed the lightship.

The difficulty which the tug encountered, in connection with her lack of power, although she had an ample supply of coal on board, should have been anticipated when she undertook the service and her failure in this respect was a fault for which she is liable. Spencer on Marine Collisions, § 122; The Margaret, 94 U. S. 494, 24 L. Ed. 146.

It is said in Spencer, pp. 261, 262:

"A tug in proffering its services to another, impliedly represents itself to be of sufficient power and equipment, and sufficiently well officered and manned to perform the services required, and that it is sufficiently well acquainted with the waters through which it is required to pass to conduct the tow in safety to its place of destination. It is also bound to know the general condition and nature of the craft seeking towage, the conditions of the weather, the natural obstacles to be met with, and to observe all other patent and well known conditions which affect the safety of the tow and that of others with whom it is liable to be brought into relation. It is not to be considered a common carrier in the usual acceptation of that term, and is not required to insure the safety of its tow other than against its own negligence, incompetence or misconduct, and is bound only to the exercise of reasonable skill and care in the execution of the task for which it is employed."

And in The Margaret, pp. 496, 497, 94 U. S., and p. 147, 24 L. Ed.:

"The tug was not a common carrier, and the law of that relation has no application here. She was not an insurer. The highest possible degree of skill and care were not required of her. She was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in every thing relating to the work ·until it was accomplished. The want of either in such cases is a gross fault, and the offender is liable to the extent of the full measure of the consequences. Brown v. Clegg, 63 Pa. 51, 3 Am. Rep. 522; The Quickstep, 9 Wall. 665, 19 L. Ed. 767; Wooden v. Austin, 51 Barb. 9; Wells v. Steam Navigation, 8 N. Y. 375; Steamer New Philadelphia, 1 Black, 62, 17 L. Ed. 84; The Cayuga, 16 Wall. 177, 21 L. Ed. 354; James Gray v. John Frazier, 21 How. 184, 16 L. Ed. 106.

The port of Racine was the home port of the tug. She was bound to know the channel, how to reach it, and whether, in the state of the wind and water, it was safe and proper to make the attempt to come in with her tow. If it were not, she should have advised waiting for a more favorable condition of things. She gave no note of warning. If what occurred was inevitable, she should have forecasted it, and refused to proceed. The spring-head of the disaster was the sudden turn of the tug around the end of the pier, combined with the shortness of the tow-lines. These involved the stopping of the tug and the loss of the steerage-way of the brig. The drifting of the latter, her impinging upon the pier, and her fracture and sinking, necessarily followed.

Conceding that the mode of entering the harbor by the tug was the best under the circumstances, and the disaster thereafter inevitable, then the effort showed a clear want of judgment. As before remarked, she should have known this, and governed herself accordingly. Her conduct, in this view, was more than an error. It was a fault; and upon this ground she should be condemned."

Decree for the libellants, with an order of reference.