### THE J. S. T. STRANAHAN.

### THE McCALDIN BROTHERS.

(District Court, S. D. New York. February 4, 1907.)

TOWAGE—INJURY OF TOW—MOVING STEAMER WITH TUGS HAVING INSUFFICIENT POWER.

Two tugs which undertook to move a steamer from the Erie Basin to a Brooklyn dock without assistance, although they lacked sufficient power to handle her safely under the conditions of wind and tide that existed, especially outside of the basin, *held* liable for her injury by striking against the piers at the entrance.

In Admiralty.

Wing, Putnam & Burlingham, for libellant.
James J. Macklin and Avery F. Cushman, for claimants.

ADAMS, District Judge. This action was brought by the Holland Gulf Steamship Company, the owner of the steamship Maria, against the tugs J. S. T. Stranahan and McCaldin Brothers to recover for the injuries sustained by the Maria on the 24th of September, 1904, while being towed by the said tugs from Robins Dry Dock in the Erie Basin to Van Brunt Street, a short distance away. She was destined to a wharf just outside of and to the north of the entrance to the Basin. The tugs made fast to her, as she was leaving the dock, the Stranahan alongside on the port quarter and the McCaldin Brothers ahead on a hawser of probably about 20 fathoms.

The steamer was light, was 340 feet long and showing considerable freeboard. The tide was flood and there was a wind from the westward of some force. Both tide and wind set upon the northern side of the entrance to the gap of the Basin. When she reached there, the steamer was dragged along the northern side of the pier, heading slightly to port, and in that way suffered some injury to her propeller. The contact threw her to the starboard which caused her to strike another pier, further out, by which she was injured to an additional extent.

The defence of the tugs is set forth in the answer as follows:

"Seventh: And for further answer to said libel and upon information and belief claimants allege: that on or about the 23rd day of September, 1904,

the master of the Steamship Maria employed these claimants to send two tugs to shift the said steamer from Robins Dry Dock in Erie Basin for the purpose of towing her to Van Brunt Street, Brooklyn to take in Bunker Coal, the master of said Steamship agreeing at the same time that he would have steam up, so as to operate the said vessel with the assistance of the said steamtugs and pursuant to said engagement or hiring the two tugs were dispatched the next day, the tide being flood and the wind blowing from the southwest, to the said steamer Maria, and the said steamtug J. S. T. Stranahan made fast on the port quarter of said vessel while the McCaldin Bros. went ahead with a hawser; whereupon it was learned that the said steamer was without any power of her own, said steamtug having arrived at about 9:45 a. m.; whereupon the master of said vessel was advised that he better employ a third tug and said master of said steamer Maria said he would take all the responsibility of shifting the said vessel by the said two tugs, and that he employed a pilot to go on the bridge of said steamer and give directions as to her movements. That while so moving the said vessel she came in contact with some submerged and unknown obstruction, throwing the said vessel out of shape, and that any harm that resulted was the result of her propeller coming in contact with said obstruction."

There was no testimony whatever to sustain the claim of an unknown obstruction, but several witnesses in behalf of the claimants said that there was an agreement respecting the steam and the use of the two tugs only. The master's testimony was taken in advance of the trial and he said:

"Q. How did you engage these tugs? Did you go, or write, or telephone, or what? A. I called in McCaldin's office.

Q. What did you order? A. I ordered tugs to move from the dry dock to Van Brunt Street.

Q. State just what conversation took place with McCaldin? A. It is hard to explain that exactly.

Q. Tell us the substance of it, if you can. First, do you know which McCaldin you talked with, or if it was a McCaldin? A. I know the man; I think it was a McCaldin.

Q. Can you describe him? A. Yes; I say I know the man, but he was a McCaldin I think. yes.

Q. You don't know his name? A. No, I don't know his name.

Q. What did each of you say? A. I said to send tugs to move the steamer in the morning, and told him the time, nine o'clock I think it was I was going to lower the dock.

Q. Did you tell him how many tugs to take? A. No; they had shifted the ship three times, but I never talked about the number of tugs; I always left them to send as many as they required. I can say that they moved her from East River to Erie Basin with two tugs."

Several witnesses on the part of the tugs testified to the contrary. It has been urged by the libellant, and the suggestion is not without force, that in view of the tugs' failure to sustain in any way the claim of an unknown obstruction, also with respect to the employment of a pilot by the steamer, which is also entirely unsupported, that credit should not be given to her contention in this respect. These direct contradictions in testimony are very troublesome, especially where there has been no opportunity for the court to see all the witnesses as in this case, the steamer's testimony having been taken out of court, and I refrain from deciding the dispute because from my examination of the case it seems unnecessary.

It appears that the tugs arrived at the dock before the steamer was quite ready to be removed therefrom. Their movements, however,

were under the guidance of the master of another tug belonging to the claimant, then laid up for repairs. The claimants' agents then proceeded to do the work with the two tugs and it subsequently turned out, and it was admitted by at least one of the witnesses for the tugs and otherwise fully proved, that they were not powerful enough to handle the steamer under the conditions of wind and tide that existed, especially outside of the Basin. They claimed, however, they did not know that when they started, hence placed one of the tugs on the steamer's port side aft, a position which was not the best to handle the steamer in view of her expected exposure to the wind and tide, as she would under' the circumstances have had more power on the steamer's starboard side to keep her off the piers on that side which she struck. The navigators said that when they started they supposed the steamer had her own steam, from seeing some escape from her, which afterwards proved to be from the donkey instead of the main boiler. They quickly discovered, however, that she had no power of her own, but said it was too late to stop, hence they proceeded though knowing they were doing so at a risk. I have not been able to understand the necessity of proceeding. It seems that there must have been some dock or place to which they could safely have resorted in this large basin, but if an available place existed it was not found and an attempt was made, with admittedly deficient power, to expose the tow to the danger of proceeding. This danger was sufficiently obvious to experienced men in the towage service, yet no enquiry was made of the steamer if her motive power was ready for use and it seems to me that this and proceeding under the circumstances clearly constitute negligence on the tugs' part. If they had established by a preponderance of the evidence that they had a right to expect the assistance of steam from the steamer, it would give the case a better aspect for them but that is in too much doubt to have any effect in relieving them of liability for the results of an ill judged and defectively executed attempt to move the steamer, of which they took entire charge.

There will be a decree for the libellant, with an order of reference.