### THE ROBERT H. SMITH.

### In re REICHERT TOWING LINE, Inc.

#### No. 13124.

District Court, E. D. New York.

March 22, 1933.

Foley & Martin, of New York City (James A. Martin, of New York City, of counsel), for petitioner.

Purdy & Purdy, of New York City (Edmund F. Lamb, of New York City, of counsel), for claimants.

GALSTON, District Judge.

In this matter there are two questions presented: First, whether the petitioner is free from liability; and second, if not, whether the liability should be limited.

The tug Robert H. Smith, with a tow of ten light scows, left Port Morris on the early morning of March 6, 1932, bound for Port Jefferson on the Long Island Sound. At that time the weather was good. When they arrived at Eaton's Neck, the wind was northeast and blowing strong, and the sea was picking up. These conditions made it advisable to turn back for safety in Northport Harbor. The tow remained at the stakeboat all that day and night, a strong northeast wind continuing.

The next morning, March 7th, the wind was still strong and kept that way for about two days. During those two days, the wind changed from northeast to northwest, and the sea was still very strong.

On the morning of March 9th, the tug and tow left Northport and headed not for Port Jefferson but for the Connecticut shore. The sea was choppy, with white caps. The tow then proceeded along the Connecticut shore for Bridgeport, the wind still northwest, or westerly, and arrived at Bridgeport about 4 o'clock that afternoon.

Now everything that happened, apparently, up to this time, was done in the exercise of wise and sound discretion. However, the matter of negligence is to be determined by the propriety of departure of the tow from Bridgeport on March 9th at about 7:30 p. m. It is the contention of the claimants that the petitioner was guilty of negligence in ordering the tow out.

The first significant fact is that weather and water conditions on the morning of March 9th were such as to deter the tug from attempting a direct voyage to Port Jefferson from Northport Harbor. The deviation to Bridgeport was solely for the purpose of effecting a safe passage to Port Jefferson. The distance from Bridgeport to Port Jefferson is a matter of from fourteen to sixteen miles across the open waters of Long Island Sound.

The wind during the morning of March 9th until about 4 o'clock in the afternoon had a velocity of about twenty miles an hour, according to the New York reports, and a velocity of twelve miles an hour according to the New Haven reports. There is some difference, too, in the readings from the two stations as to the direction of the wind. New York reported the wind from the northwest up to about noon, then swinging to the west until about 4 o'clock, after which it came from the northwest; whereas New Haven reported the wind in the morning until 4 in the afternoon from the west, with occasional swings to the southwest or northwest.

At the time of departure from Bridgeport the tide was flood and had been so for about an hour, running in a westerly direction; and since the wind was blowing out of the westerly quarter of the compass, wind and tide were in opposite directions.

With the strong wind that had been prevailing for two or three days, with the choppy sea, with the unfavorable conditions for a direct voyage from Northport to Port Jefferson, and with the wind and tide prevailing as they did at 7 o'clock on the evening of March 9th, with the weather reports in mind, particularly those from New York, but to a lesser degree also those from New Haven, the thought is irresistible that the tug invited hazard when she ventured forth from Bridgeport that evening with a light tow of ten scows.

The captain had called up the New York office of the petitioner to record his arrival at Bridgeport. It is significant that following that call he made no arrangements to depart. He did not go outside of the breakwater to observe the conditions or indeed to make any other observation. Somewhat reluctantly the captain admitted that he would (i. e., customarily) wait around Bridgeport for a chance to go out, "because you might go out once in about six hours." That in itself rather indicates that, had the captain been left to his own judgment, he would have waited for the coming of the ebb tide. But about 5:30 that afternoon the petitioner's office called him back at Bridgeport, and following that call, within an hour and a half, the tow left for Port Jefferson.

As further proof of the captain's state of mind in respect to the wisdom of avoiding early departure for Port Jefferson, it appears that he told the engineer that while in Bridgeport the engineer would have time to clean out the condenser, saying: "I told him he might have all night;" but, following the call from New York, he instructed the engineer to finish his work so that they could leave.

There was no indication from any source, including the barometer readings, which would have justified the captain of the tug in believing that weather conditions were improving or had improved over that which he encountered on the trip from Northport.

The inevitable happened. As the tow left the shelter of the Connecticut shore, the wind and seas were felt with considerable force, the light boats pounded, some of them breaking connecting hawsers and breast lines; and the farther they proceeded the worse conditions became. The tow had reached about the middle of the sound when the starboard tier broke away. The tug circled around and picked up the tier and proceeded on her way. The banging and jamming and breaking of lines continued, and the starboard tier was again adrift. The tug proceeded with the port scows, and the five starboard scows drifted through the night and finally were beached in the morning along the Long Island shore.

It seems to me that the negligence of the petitioner stands out. The Eli B. Conine (C. C. A.) 233 F. 987. See, also, The Vandercook (D. C.) 65 F. 251, and The Benjamin H. Whorford (D. C.) 290 F. 816.

The petitioner, as a defense, has offered proof of the defective bitt on the starboard hawser scow, but neither the exhibit nor the testimony in connection therewith establishes the existence of such defect.

On the second branch of the case, petitioner claims that the tug was seaworthy and is entitled to limitation. The contention of the claimants is that the tug was insufficiently manned, and that it was inadequately equipped with lines. When the tug arrived at Northport, her captain, Sullivan, left to attend to business of the petitioner in court on the following day. When she set out from Bridgeport, the tug had only two deck hands instead of three, as required, and had but one licensed man on board instead of two. If it could have been shown that this shortage contributed to the accident, perhaps liability could have been spelled out. But as was said in The El Sol (D. C.) 45 F.(2d) 852, 855: "To preclude limitation on the ground of privity or knowledge it is not, in my opinion, sufficient merely to prove that there was a failure in equipment inspection or personnel to which the shipowner was privy or of which he had knowledge. It must be shown that the fault in equipment, inspection, or personnel actually contributed to the accident in respect of which the shipowner seeks limitation."

In the matter of sufficiency of lines, claimants assert that there was but one towing cable, and that the only hawser which the tug had for emergency use was the anchor line. This anchor line had been subjected to considerable strain prior to the 9th, for under date of March 7th there is an entry in the log: "Dragged anchor all over." And on March 8th: "Boat working all the time (dragging)." The entry on March 9th read: "12:01 a. m. to 7 a. m., weatherbound, ten light scows, Northport, northwest gale, boat working all the time, dragging."

Furanski, one of the deck hands on the tug, said that the hawser (the anchor line) parted about midway of its length. It is significant, also, as admitted by the tug's captain, that the line snapped shortly after having been put out, and there was no other line on the boat which could have been used to pick up the drifting scows.

In the circumstances, the tug was not adequately equipped, and must be held, therefore, responsible without limitation. The Portchester (C. C. A.) 18 F.(2d) 75. In this respect the claimants have met the burden of proof imposed upon them to establish that the drifting of the scows was due to the unseaworthiness of the tug. The Calvert (D. C.) 37 F.(2d) 355.

From the telephone conversations between the tug boat captain and petitioner's office it must be assumed that the petitioner was apprised of the emergencies which were likely to be encountered on the voyage across the Sound. Therefore, it cannot successfully plead absence of privity or knowledge of the fact that in the circumstances the tug was equipped with insufficient lines to meet such emergencies. See McGill v. Michigan Steamship Co. (C. C. A.) 144 F. 788.

For the foregoing reasons the petition must in all respects be dismissed.

Settle decree on notice.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.