THE MARGUERITE W.

THE FLORENCE J.

Petition of LAKEHEAD TRANSP. CO., Ltd.

No. 475.

District Court, E. D. Wisconsin.

March 17, 1943.

Kremer, Branand & Hayes, of Chicago, Ill., Emmet Horan, of Milwaukee, Wis., and Frank Wilkinson, of Chicago, Ill., for petitioner.

Jerome R. North and Walter T. Bie, both of Green Bay, Wis. (North, Bie, Duquaine, Welsh & Trowbridge, of Green Bay, Wis.), G. S. Jersild, Follansbee, Shorey & Schupp, and John F. Baker, all of Chicago, Ill., for claimants.

DUFFY, District Judge.

This is an action in admiralty, commenced by the petition of Lakehead Transportation Company, Ltd., for exoneration from or limitation of liability as owner of the steam tug "Marguerite W" and of the barge "Florence J". The Kewaunee, Green Bay and Western Railroad · Company and Charles M. Thompson, Trustee of the property of the Chicago and North Western Railroad Company, who are the claimants herein, are the joint owners of a railway bridge extending across the Fox River in the city of Green Bay, Wisconsin.

September 17, 1940, was a bright, sunshiny day at Green Bay. There was a moderate wind from the south; no unusual weather conditions had prevailed for several days prior thereto; there had been no rain in this area for some time previous which could have caused an increased flow of water in the Fox or East Rivers. Neither had there been a strong wind from the north which could have caused the water in Green Bay harbor or the Fox or East Rivers to back up. Current in the Fox River on the day in question was moderate, not exceeding one or two miles per hour.

The steam tug "Marguerite W" was 120 ft. in length and 28 ft. in breadth; the barge "Florence J" was 352 ft. in length and 44 ft. in breadth. Both tug and barge were and are now owned by the petitioner. The barge was without motive power. The East River is a comparatively small, shallow stream, of only a few miles in length, which flows into the Fox River at an angle running from southeast to northwest, and the center of the outlet would be some 400 to 500 ft. south of the railroad bridge owned by the claimants. The Fox River at this point runs approximately in a northerly direction and the railway bridge is generally in an east to west direction, although at an angle to the southeast. The bridge rests upon a center protection pier which extended 150 ft. south from the bridge when it was closed. When the bridge was open, there was a width of 90 ft. in the east draw, and traffic on the river customarily used this passageway.

Shortly before noon on September 17, 1940, the barge "Florence J" was moored at the Hurlbut Coal Company dock, with the prow facing down river in a northerly direction. The tug "Marguerite W", intending to tow the barge out of Green Bay and finally across Lake Superior, fastened onto the tow line which was on the deck of the barge. This tow line was a steel cable about 1½" in diameter and about 1,250 ft. in length. It was operated by a machine in the nature of a windlass, which was located upon the deck of the barge, and which could release as much line as was desirable. The testimony showed that for lake towing about 1,000 ft. of cable is used; for ordinary river towing, about 200 ft. It also seemed finally agreed that for harbor work, such as going through draws of bridges, a tow line of over 60 or 70 ft. should not be used. The amount that was used on this occasion was sharply in dispute.

The tug first pointed out into the river in a generally northwesterly direction, in order to pull the prow of the barge away from the dock. It then endeavored to straighten out and head directly for the draw on the easterly side of the bridge. At a distance some 400 to 500 ft. south of the bridge several witnesses noticed that the barge was proceeding on a line westerly of the course taken by the tug. There was no

condition of weather, wind, or current that should have caused the barge to sheer, sag, or set down on a course westerly from that of the tug. The master of the tug finally discovered the situation and took a course as far to the east as he could, but he was then about to enter the draw and was unable to bring the barge over eastward to the proper channel. As a result, the barge first struck the protecting pier a heavy blow, and thereafter struck the bridge itself, causing the damage complained of in this action.

The barge damaged the bridge by reason of faulty seamanship, unless in some mysterious way an act of God intervened and caused the barge to proceed along a course westerly to that of the tug. The only explanation that petitioner ventures is that there must have been a current from the East River that operated to force the barge over to a course further west than that taken by the tug. If such a current did exist, it was visible to no one and there was nothing in the weather conditions which would account for it.

I am convinced that there were a number of acts of negligence which combined to cause the collision and resulting damage to the bridge: (1) The tow line was too long for safe operation under the conditions present. A distance of more than 100 ft. existed between the stern of the tug and the bow of the barge. (2) Prudent seamanship required a course further to the east than that taken by the master of the tug. (3) The harbor tug which was available should have been used with a stern line. (4) The barge did not make effective use of its rudder. (5) The crews of both the barge and the tug were negligent in not discovering earlier the course of the barge, so that signals might have been exchanged and corrective measures taken.

The mere statement of the acts of negligence should be sufficient, without more than the briefest comment. If a tow line of 60 or 70 ft. had been used, the tug would have had greater control over the course taken by the barge. That a course further to the east should have been taken is self-evident, and was the course usually taken by other masters under similar conditions. The harbor tug was available without additional charge, and much greater control of the barge could have been obtained had this tug been guiding the barge with a stern line. Also no plausible reason, except inattention and carelessness, can explain the delay of the crews on the tug and on the barge in discovering the dangerous course taken by the barge, and in throwing over its rudder.

Petitioner claims the statutory right of limitation under Title 46 U.S.C.A. § 183, 49 Stat. 1479, which provides: "The liability of the owner of any vessel, * * * for any * * * loss, damage, or injury by collision * * * done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not * * * exceed the amount or value of the interest of such owner in such vessel * * *". As the owner in this case is a corporation, a determination of the claim of limitation requires an examination of the status of Captain Shaw, who is, and was on the day in question, the treasurer of the corporation and the shore captain at Green Bay. The question arises, Was he a managing agent or managing officer of the petitioner? Craig v. Continental Insurance Co., 141 U.S. 638, 646, 12 S.Ct. 97, 35 L.Ed. 886. Captain Shaw was the only representative which the company kept at Green Bay during the navigation season. He did not have an office at Green Bay, and when there lived at a hotel. He looked after the upkeep of the vessels. He attended to the loading and unloading of pulp wood, as well as the fueling of the vessels. Whenever a tug or barge was drydocked, he would examine the vessel. He did not hire the masters or members of the crew, but when an application for the position of master came into the company, his opinion was asked. When masters had been hired by the company, Shaw gave the instructions as to when to report. The tug and barge captains took orders from Captain Shaw.

In the fall of 1939 or the spring of 1940, Shaw was given the title of treasurer. However, he had no authority to sign checks and never signed any; he owned no stock in the company and had never been on the board of directors. He testified that he asked for the title of treasurer so that he might board vessels prior to the arrival of the customs officers, as customs regulations prohibited that privilege to anyone but the master of the vessel or an officer of the company. Claimants point out that it was stipulated at the time of the pre-trial conference that L. H. Shaw was treasurer of the Lakehead Transportation Company and nothing was said about any limitations as to his duties or title, and furthermore that the interim stipulation for a monition and stay filed herein was signed "Lakehead Transportation Company, Ltd.,

by L. H. Shaw, Treasurer." Claimants contend that petitioner should, therefore, be estopped from claiming that Captain Shaw did not have the usual and customary duties of a treasurer.

It was explained to counsel at the pre-trial conference that the court desired that stipulations be entered to simplify the issues and to obtain admissions of fact which would shorten the time of the trial. As I recall it, the expression that I "desired all cards to be placed on the table" was used. When proctors for petitioner stipulated that Captain Shaw was the treasurer of the Lakehead Transportation Company, they were duty bound to disclose any limitations such as now claimed, for in effect they produced testimony at the trial that he was treasurer in name only. Proctors now say that they did not know of these limitations at the time of the pre-trial conference, but they certainly became aware of them prior to the date of the trial and it was their duty to have made full disclosure.

■ A managing officer is one to whom the corporation has committed the general management or superintendence of the whole or a particular part of its business. The Erie Lighter 108, D.C., 250 F. 490. Captain Shaw was in charge of the company's business at Green Bay except as to matters pertaining to the crew which, under the rules of maritime law, are entrusted to the master or captain of the ship. Butler v. Boston & S. S. S. Co., 130 U.S. 527, 544, 9 S.Ct. 612, 32 L.Ed. 1017; American-Hawaiian S. S. Co. v. Pacific S. S. Co., 9 Cir., 41 F.2d 718, 720. While it is difficult to say how much each of the elements of negligence contributed to the collision, nevertheless it is true that Captain Shaw had full knowledge of the custom of taking the barge through the draw without the assistance of the harbor tug with a stern line. He knew that such tug was available. He was on the dock when the tug and barge pulled away. His knowledge was the knowledge of the company. Under such circumstances, the petition for limitation of liability must be denied.

Claimants ask to be compensated for a number of items of damage which are sharply contested by the petitioner. In order not to prolong this opinion unnecessarily, I shall indicate the items which I consider proper as elements of damage, and the balance of said items shall be considered disallowed. First I shall list the general items, the amount of which is to be divided equally between the claimants.

Undisputed items:

| | |
|---|---|
| Repair bill of bridge | $68,000.00 |
| Inspectors | 47.12 |
| Telephone calls | 22.36 |

Disputed items:

| | |
|---|---|
| Protection clusters of piling | 6,410.00 |
| Notices in newspapers | 81.95 |
| E. B. Nancarrow, inspector | 675.00 |
| Repair of damaged lift rails | 50.85 |
| Total | $75,287.28 |

Items allowed to claimant Kewaunee, Green Bay and Western Railroad Company:

| | |
|---|---|
| One-half of above-mentioned general items | $37,643.64 |
| Rerouting charges | 16,103.25 |
| Wages paid for excess time consumed in making the detour: | |
| Conductors and brakemen | 1,997.85 |
| Engineers and firemen | 1,724.24 |
| Fuel consumed by locomotives, based on excess time required in making detour | 1,761.01 |
| Lubricants, water, sand, and other locomotive supplies consumed, based on excess time required in making detour | 89.68 |
| Total | $59,319.67 |

Items allowed to claimant Charles M. Thompson, Trustee of the Chicago and North Western Railroad Company:

| | |
|---|---|
| One-half of above-mentioned general items | $37,643.64 |
| Rerouting charges | 4,118.88 |
| Wages paid for excess time consumed in making the detour: | |
| Conductors and brakemen | 1,154.22 |
| Engineers and firemen | 760.74 |
| Fuel consumed by locomotives, based on excess time required in making detour | 692.51 |
| Lubricants, water, sand, and other locomotive supplies consumed, based on excess time required in making detour | 79.29 |
| Total | $44,449.28 |

The item of interest urged by claimants will not be allowed.