THE SEVERANCE.

THE STONE 6.

DIAMOND S. S. TRANSP. CORPORATION et al. v. PEOPLES SAVINGS BANK & TRUST CO. et al.

No. 5389.

Circuit Court of Appeals, Fourth Circuit.

Dec. 27, 1945.

Thomas H. Middleton, of New York City (Hill, Rivkins & Middleton, of New York City, and Louis J. Poisson, of Wilmington, N. C., on the brief), for appellant Texas Gulf Sulphur Company, Inc.

George Rountree, Jr., of Wilmington, N. C., and Gerald J. McKernan, of New York City (Rountree & Rountree, of Wilmington, N. C., and Macklin, Brown, Lenahan & Speer of New York City, on the brief), for appellant Diamond Steamship Transportation Corporation, Inc.

John W. Oast, Jr., of Norfolk, Va. (Carr, James & Carr and Murray G. James, all of Wilmington, N. C., on the brief), for appellees.

Before SOPER and DOBIE, Circuit Judges, and HARRY E. WATKINS, District Judge.

DOBIE, Circuit Judge.

Texas Gulf Sulphur Company, Inc. (hereinafter called Texas), owner of a cargo of sulphur lately laden on board the steamship "Severance," and Diamond Steamship Transportation Corporation (hereinafter called Diamond), owner of the Steamship "Severance," filed a libel in admiralty in personam, in the United States District Court for the Eastern District of North Carolina, against R. R. Stone, trading as Stone Towing Line. The Peoples Savings Bank and Trust Company, Guardian of Thomas H. Stone, an incompetent, as owner of the gas screw tug "Stone 6" intervened on a petition for limitation of liability. From a decree of the District Court adjudging that the loss suffered by the libellants was not caused by the neglect of the respondents, the libellants, Texas and Diamond, have duly appealed.

918

The "Severance" was a turret type vessel with a registered tonnage of 4,993 tons gross and 3,373 tons net, with a length of 366 feet, a beam of 53 feet and a depth of 24.9 feet. She is a single-screw vessel, built in England in 1909, with her air pump activated by the movement of her propeller shaft.

The "Stone 6" was a gas screw tug with a length of 94.3 feet, a beam of 20.5 feet and a depth of 6.3 feet. Her engine was of 200 horsepower, capable of being gagged up to 300 horsepower.

Under a contract between the libellants and respondent, R. R. Stone, the "Severance," under tow of the "Stone 6," was proceeding from Wilmington, North Carolina, up the northwestern branch of the Cape Fear River to Navassa. The "Severance" collided with the fender piling of the highway bridge across the river near Point Peter, sank soon after the collision, and her cargo of sulphur was severely damaged.

No opinion was filed by the District Judge, who wrote to the proctor for respondents that the District Judge found the respondents without fault and therefore relieved of liability. In this letter the District Judge requested the proctor for respondents to present findings of fact and conclusions of law. The District Judge then, practically in toto, adopted these findings and conclusions.

■ This practice is not to be commended. It has been condemned by many courts as not living up to the provision of Admiralty Rule 46½, 28 U.S.C.A. following section 723: "In deciding cases of admiralty and maritime jurisdiction the court of first instance shall find the facts specially and state separately its conclusions of law thereon." See Irvine v. The Hesper, 122 U.S. 256, 7 S.Ct. 1177, 30 L.Ed. 1175; Petterson v. New York Central R. Co., 2 Cir., 126 F.2d 992; Schilling v. Schwitzer, 79 U.S.App.D.C. 20, 142 F.2d 82; City of New York v. McLain Lines, 2 Cir., 147 F.2d 393; Chicago, D. & G. B. Transit Co. v. Moore, 6 Cir., 259 F. 490. We do not hold that the practice affords a ground for reversing the decree of the District Court. We content ourselves by observing that these findings of fact and conclusions of law are not, at our hands, entitled to the same weight and dignity which they would have possessed had they represented the unfettered and independent judgment of the trial judge.

The contract here, we think, was not a mere contract of towage, it was also a contract of pilotage. All the surrounding circumstances clearly indicate this.

The record abounds with evidence to prove that, just before the "Severance" reached the highway bridge, she took a sudden sheer to port and collided with the piling. On the fateful morning, Dosher boarded the "Severance," went up on her bridge, and the tug "Stone 6," in pursuance of his orders, was made fast with a hawser to the steamer's bow. Dosher informed Captain Hardy of the "Severance" that he (Dosher) delayed his arrival somewhat to move the "Severance" at the proper stage of the tide. At Dosher's command, the anchor of the "Severance" was raised, her engines were started and the trip up the river began. The weather was clear, a slight wind prevailed, the tide was the last of the ebb.

Just before the collision, Captain Hardy asked Dosher's permission to go below for lunch, and, on Dosher's assent, Captain Hardy left the bridge. At the time of the collision, Cooper, third mate of the "Severance," was on the bridge, standing by the engine room telegraph to relay Dosher's commands to the engine room, and a seaman was at the wheel. Dosher was thus in complete command.

When the sheer to port by the "Severance" occurred, Dosher ordered the engines full speed astern and the helm hard right. These commands, which seemed proper, were promptly obeyed. The sheer to port, however, continued, the hull struck rocks on the bottom of the river and the steamer soon sank. Then arise the apposite inquiries: What caused this sheer to port? Who, if anyone, was responsible therefor? The answers are not absolutely forthright and clear.

■ We start with the rule that when the "Severance," in complete control of Dosher, in waters with which he was familiar, on a clear day with a light wind, ran into a readily visible stationary object, the piling of the bridge, this raises a presumption of negligence on Dosher's part that at least calls for some reasonable explanation of the collision. As far back as 1877, Mr. Justice Clifford said in The Virginia Ehrman, 97 U.S. 309, 315, 24 L.Ed. 890.

"Vessels in motion are required to keep out of the way of a vessel at anchor, if

the latter is without fault, unless it appears that the collision was the result of inevitable accident; the rule being that the vessel in motion must exonerate herself from blame, by showing that it was not in her power to prevent the collision by adopting any practicable precautions."

See, also, The Louisiana, 3 Wall. 164, 70 U.S. 164, 173, 18 L.Ed. 85; The Bertha F. Walker, 2 Cir., 220 F. 667, 668; Savannah & New York Transportation Co. v. Klaren Bridge Co., 4 Cir., 252 F. 499, 504; United States v. Norfolk-Berkley Bridge Corporation, D.C., 29 F.2d 115, 126; Louis Dreyfus v. Paterson Steamships, 2 Cir., 43 F.2d 824, 825, 72 A.L.R. 242.

■ Appellees attempt to explain the collision on the grounds that the "Severance" was a cranky vessel and difficult to handle, that her engine response was faulty and her steering gear defective. We are not impressed by these contentions. Appellees knew what nature of ship she was before the contract was made or the voyage up the river was started. The testimony of Captains Dosher, Peders and Cudworth is far from convincing. This was more than offset by the testimony of the officers and crew of the "Severance." And it is particularly noteworthy that Captain Dosher made no complaint on this score before the collision. Much more important is the fact that his testimony before the Marine Investigation Board, given four days after the accident, is at complete variance with his testimony given at the trial. Before this Board, Captain Dosher, when directly asked: "Was the steering gear in good condition?", replied: "Seemed to be." Again, before the Board, to the question: "You had full cooperation from everybody on board: engine-room signals answered, various orders carried out?" his reply was: "Yes, sir." See, The Mercury, 1 Cir., 2 F.2d 325, 326; The Perseverance, 2 Cir., 11 F.2d 527. And, in The President Polk, 2 Cir., 43 F.2d 695, 696, Circuit Judge Learned Hand pointedly said:

"The master's own report, made the very day of the accident, completely disposes of his testimony."

As to the cause of the sudden sheer of the "Severance," the testimony of Captain Dosher before the Marine Investigation Board is very revealing:

"Q. How do you account for the vessel taking the sheer? A. Captain, I couldn't figure that out. Usually if a vessel is going to sheer going through there they will sheer when they first strike the point. She was going so steady until she got right in the draw and what took that notion *unless on the last of the freshet from back current on the bottom or got a suction from the bank.*" (Italics ours.)

And, again:

"Q. Did you think there was anything unusual about the current at that time? A. No, nothing that I could discern from the surface of the water at that time. It was the last stage of a freshet and there would be a kind of back current underneath, not noticeable from the top." This is strengthened by the testimony at the trial given by Mate Cooper of the "Severance," who was on the bridge before, and at the time of, the collision.

"* * * in the river itself there wasn't any indication of much current at the time we got under way, because it was slack water as near as I can recall, but *when we got around this Point Peter why the tide there was running like a mill race. It was all the difference in the world. * * *"*

"I noticed all kinds of whirlpools when we rounded Point Peter."

And, also:

"Q. At the time or very shortly after the time of the vessel running into those whirlpools is when it took that sheer to port? A. After we got in those whirlpools."

And under cross-examination by Mr. Oast:

"Q. Captain, these tide whirls that you have referred to in your answers to questions by Mr. Wright, those were located almost in the draw of the bridge, were they not? A. Well, I would say they were a ship's length from the bridge.

"Q. And they were well to the west of Point Peter, were they not? * * *

"The Witness: *West of the point, a little bit better than a ship's length from the bridge. * * *

"* * * The best way I can explain that is when you come around Point Peter you just go inside the point when you run into these whirlpools, not outside the point, but inside, after you make your turn." (Italics ours.)

■ From this testimony, and further evidence in the record, we feel that the

condition of the river, at the place and time of the accident, due to situations arising from the freshet, offers the most plausible explanation of the sudden sheer taken by the "Severance."

As to the liability of the navigator under such circumstances, the following cases are highly informative. The Webb, 14 Wall. 406, 81 U.S. 406, 20 L.Ed. 774 (tug held liable for damages to her tow by stranding, when the tug claimed the stranding was due to unexpected currents); The W. G. Mason, 2 Cir., 142 F. 913 (steamer, under control of tugs, was carried by strong current upon rocks on the side of the channel); Gilchrist v. Great Lakes, D.C., 237 F. 432 (ship, towed by tugs, struck a bridge). And peculiarly apposite here is the statement of Circuit Judge Lurton (afterwards Associate Justice of the United States Supreme Court) in The Australia, 6 Cir., 120 F. 220, 222:

"To say that her erratic course in bounding backward and forward across the channel was due to a sheer is no defense, unless she (that is, those in charge of her navigation) can show that that sheer was unavoidable; that is, that the cause which started the sheer and maintained it was a force which she could not resist or guard against by that reasonable degree of skill required from a navigator in the waters where the sheer occurred."

We must presume here that Captain Dosher either knew, or by the exercise of reasonable care should have known, of the prevailing conditions on the Cape Fear River. By undertaking to act as pilot of the "Severance," he promised the skill of his art. Spondet peritiam artis. The Dora Allison, D.C., 213 F. 645, 646; Union Shipping & Trading Co. v. United States, 2 Cir., 127 F.2d 771, 775. Dosher knew that the "Severance" was a turret type ship and was familiar with ships of that class. See, particularly, The West Eldara, 2 Cir., 101 F.2d 45. See, also, The Delaware, D. C., 12 F. 571; The Howard Carroll, D.C., 41 F. 159; The Penzoyd, D.C., 157 F. 134; The Madison, 2 Cir., 250 F. 850.

In the light of what has been said, we feel constrained to hold that the negligence of Captain Dosher was a proximate cause of the damage to the "Severance" and her cargo. And for this damage the respondent, R. R. Stone, is legally liable.

■ Another basis for the finding of negligence here, we think, was the furnishing of a small tug, "Stone 6" which was not competent for the proposed undertaking, when H. B. Stone sent Captain Dosher with this tug to tow the "Severance" up the river. In Dunn v. The Young America, 8 Fed.Cas. page 102, No. 4,178, District Judge William Butler strikingly said:

"It was the duty of Mr. Pride and his co-contractors to furnish a tug fully competent to perform the service which they had undertaken, with safety; and, if one was not sufficient, to add another. The responsibility was on them to determine the amount of force needed, and to perform the service with the care and skill required by the circumstances."

And see, also, cases cited in this opinion under the subject of privity. The testimony of Captain Dosher here was quite revealing:

"Q. What was your answer to my question that if a sheer developed could it not have been prevented by having a tug on the starboard quarter as well as the 'Stone No. 6' on the bow? A. The tug when it started to sheer would have made her straight.

"Q. And that would have prevented the sheer? A. Yes, sir.

"Q. That is (with) a tug on the starboard quarter the sheer could have been prevented? A. I would say that would be about the only way it could have been prevented."

This brings us to the question raised by the petition for limitation of liability to the tug "Stone 6" and freight then pending. The General Limited Liability Statute, 46 U.S.C.A. § 183(a), reads:

§ 183. *Amount of liability; loss of life or bodily injury; privity imputed to owner; "seagoing vessel".*

(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

It was not necessary for the District Court to rule definitely on this question,

since that Court held the respondents free from blame. The District Court adopted certain findings, however, that have some bearing on the problem.

We think this petition for the limitation of liability should be denied for two reasons: (1) R. R. Stone was not a charterer of the tug; (2) privity and knowledge.

Under the express provisions of 46 U.S.C.A. § 186, the charterer of a vessel may limit his liability. Appellants here contend that the petitioner, R. R. Stone, was not a charterer within the terms of the statute. In spite of a contrary holding (by way of dictum) in the District Court, we think this contention is sound.

 The law seems settled that the statute does not cover a mere bailee as distinguished from a charterer. Jones & Laughlin Steel Corporation v. Vang, 3 Cir., 73 F.2d 88, certiorari denied 294 U.S. 735, 55 S.Ct. 406, 79 L.Ed. 1263. See, also, Benedict on Admiralty (6th ed.) p. 416. In the Jones & Laughlin case, just cited, it was held that the claimant must rather convincingly prove an express charter. Said Circuit Judge Woolley in this case, 73 F.2d 90, 91:

"Thus it devolved upon the respondent to prove a charter. This it undertook to do by two lines of evidence: One, that it did 'man, victual, and navigate' the barge in the waters about its plant, and, interpreting the word 'victual' as not in every case meaning food but including 'supplies' such as tackle, was within the statute. This was error. The expression 'man, victual, and navigate' is descriptive of the kind of 'charterer' who shall be deemed 'owner' and be entitled to limitation of liability. It presupposes a charter.

" 'The *charterer* of any vessel, in case he shall man, victual, and navigate *such* vessel (that is, the vessel chartered) * * * shall be deemed the owner.' The fact that one possessing a vessel has done these three things does not prove that he is a charterer. That remains to be proved by other evidence; then, when proved, evidence of the triple acts becomes necessary to make effective and obtain the privileges and immunities of the statute.

\* \* \* \* \*

"A charter party is a specific and, we venture to say, an express contract by which the owner lets a vessel or some particular part thereof to another person for a specified time or use. 58 C.J. 106; Ward

v. Thompson, 22 How. 330, 63 U.S. 330, 16 L.Ed. 249; The Harvey and Henry, 2 Cir., 86 F. 656. A diligent search has failed to uncover any law on a charter party by implication. All the law available to us deals with a charter party as an express contract, whether written or oral. Benedict's Admiralty (4th Ed.) § 200. Being an express contract it must be proved yet may be construed like any other contract. Declining to find a charter by implication we are asked to construe the coal contract as a charter party. 24 R.C.L., pp. 1093, 1097 * * *." Cf. E. I. duPont de Nemours & Co. v. Bentley, 2 Cir., 19 F.2d 354.

 The only evidence to prove the alleged oral charter here was that of the most keenly interested party. It seems that the guardian of the incompetent owner had no knowledge (at the time of the collision) that its ward owned the tug; a former guardian had not listed the tug among the assets of the ward; no charter money ever seems to have been paid to the guardian; there is no record that any court ever approved the contract of charter. See Uzzle v. Wood, 54 N.C. 226; Pate v. Kennedy, 104 N.C. 234, 10 S.E. 188. And see N.C. G.S. §§ 33-2, 33-20. And in a libel against The Pejepscot, 1939 A.M.C. 316, Stone made statements as to his relation to the tug "Stone 6" quite inconsistent with his evidence in the instant case.

We accordingly feel constrained to hold that Stone was not the charterer of the tug "Stone 6." He was at best a mere bailee or a trustee ex maleficio. Thus he cannot claim the benefit of the Limited Liability Act.

 A second ground for the denial of the petition for limitation of liability, we think, is privity. It is quite clear from the testimony of R. R. Stone that the active management of the business was entrusted to his son, H. B. Stone. R. R. Stone explicitly testified:

"Q. And you have not been in active charge of the Stone Towing Line since you have been sick? A. No, for the last seven or eight years I have not.

"Q. Your son, H. B. Stone, is in charge? A. Yes, he attends to it all. He is my son and he has the power to do anything he pleases, anything at all."

It would thus seem that the knowledge and privity of H. B. Stone is that of R. R. Stone. The Robert H. Smith, D.C., 3 F.Supp. 531; The Marguerite W., D.

C., 49 F.Supp. 929; The Marguerite, 7 Cir., 140 F.2d 491; The Chickie, D.C., 54 F.Supp. 19; Eastern Steamship Co. v. Great Lakes Dredge & Dock Co., 1 Cir., 256 F. 497.

In considering the knowledge and privity of H. B. Stone we should bear in mind that the tug was hired in her home port and was to perform a service in the immediate neighborhood under the supervision of the pilot who was also furnished by H. B. Stone. This accident happened only about 1500 yards from the anchorage. In short, the tug was engaged to perform a service with which the managers of the Stone organization were, or should have been, thoroughly familiar. It was incumbent upon them to know the conditions of the nearby river and the adequacy or inadequacy of the tug with which they undertook to carry the steamship safely on its way. Moreover, H. B. Stone, the general agent in charge for his father, the owner of the business, testified expressly that he told Dosher to take the tug "Stone 6" and get the "Severance" at her anchorage; and he actually saw these vessels pass by. This evidence clearly shows that Stone knew, or should have known, that a tug, which proved to be inadequate, was to be used; and this constituted negligence on his part.

In the light of these facts, considered against the background of the entire record, we feel constrained to hold, in spite of some indefinite testimony to the contrary given by H. B. Stone on cross-examination, that it was H. B. Stone, rather than Captain Dosher, who made the decision that the "Severance" was to be towed by the smaller tug "Stone 6," not by the larger tug, not by two tugs. On this point, H. B. Stone testified: ·

"Mr. Edwards came down on November 23 and said he required tugboat service to take the ship up the River to Armour's. So *I told Captain Dosher to take No. 6 and go and give what service he could.*" (Italics ours.)

▋ Finally, in this connection, it is well settled that one seeking limitation has the burden of proving lack of privity or knowledge. Coryell v. Phipps, 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363; The E. Madison Hall, 4 Cir., 140 F.2d 589, 591, certiorari denied. W. E. Valliant Co., Inc., v. Rayonier, Inc., 322 U.S. 748, 64 S.Ct. 1159, 88 L.Ed. 1579; Robinson on Admiralty, § 124, p. 742. The testimony of the two

Stones, R. R. Stone the father, and H. B. Stone the son, does not, we feel, carry this burden. We, accordingly, hold that the privity or knowledge of H. B. Stone, here attributable to R. R. Stone, is a sufficient basis for denying the petition for limitation of liability.

Though we think, as has been indicated, that the petition for limitation of liability should be denied on the two grounds previously set out—(1) R. R. Stone was not a charterer of the tug "Stone 6"; (2) privity and knowledge of H. B. Stone attributed to R. R. Stone—there is still a further contention which should be considered by us. Libellants strenuously urge that the whole factual background here is one that negatives any limitation of liability.

The basis of this contention of libellants is that here was a libel *in personam* and not *in rem;* that the libel claimed no negligence on the part of either the tug "Stone 6" or anyone on board of her at the time of the collision. Hence, libellants assert, the tug was in no way responsible for the collision and, therefore, there was here *no offending vessel* to be surrendered, so that liability cannot be limited to the value of the tug and freight then pending.

▋ The question is rather close and no case has been turned up by the researches of counsel, or our own research, which definitely passes on this precise problem. Five things, however, do seem to be quite definitely established: (1) It is of course trite to say that the inanimate vessel could have had no responsibility for the accident, but it is the distinguishing and characteristic feature of admiralty jurisprudence that a suit *in rem* may be brought against a vessel which is involved in an accident where loss of life or property is caused by the negligence of the owner or the men in charge; Liverpool, etc., Navigation Co. v. Brooklyn, etc., Terminal, 251 U.S. 48, 40 S.Ct. 66, 64 L.Ed. 130, though the mere presence of a vessel at the scene of the accident does not make it an offender. The Laforrest L. Simmons, D.C., 276 F. 61. (2) The right of an owner to limit his liability, in a proper case under the statute, cannot be frustrated by the mere failure of the injured party to file a libel *in rem* or to allege liability on the part of the vessel. The City of Norwich, 118 U.S. 468, 502, 6 S.Ct. 1150, 1161, 30 L.Ed. 134; Hartford Accident & Indemnity Co. v. Southern Pacific Co., 273

U.S. 207, 217, 47 S.Ct. 357, 71 L.Ed. 612. (3) A tug, in her home waters at any rate, is chargeable with knowledge of general conditions of navigation, such as tides, currents, chanels, depth of waters and well-known obstructions. The Margaret, 94 U. S. 494, 24 L.Ed. 146; Gilchrist Transportation Co. v. Great Lakes Towing Co., D.C., 237 F. 432, 434. (4) The tug impliedly warrants that she has sufficient power and ability to perform the service to be undertaken, under conditions which are to be reasonably anticipated. See the two cases just cited above and The E. T. Williams, D.C., 126 F. 871; The J. S. T. Stranahan, D.C., 151 F. 364; Id., 2 Cir., 165 F. 439. See, also, Spencer on Maritime Collisions (1896) § 126. (5) When a tug of known insufficient power is furnished, this may provide the basis for a libel in rem against the tug; The E. T. Williams, D.C., 126 F. 871; Dunn v. The Young America, D.C., 8 Fed. Cas. page 102, No. 4,178; The Startle, C. C., 115 F. 555; The Charles B. Sandford, 2 Cir., 204 F. 77; The Oneida, 2 Cir., 282 F. 238.

It seems to us that negligence of the owner in furnishing an incompetent tug should be imputed to the tug, just as is the negligence of the navigators charged with the handling of the tug at the time of the collision. We feel confident that the "Stone 6" would, for the purpose of limitation of liability, be considered an offending vessel had she possessed a defective boiler or had her steering-gear been in bad condition and these faults contributed to the catastrophe. We see no valid reason for distinguishing in such a case a tug which was equally inefficient for the task undertaken because the tug lacked adequate power for her appointed task.

It seems not inappropriate here to point out the generally accepted holding that the Limited Liability Statute should be liberally construed. Judge Woods, speaking for this Court in Peoples Navigation Co. v. Toxey, 269 F. 793, 794, said:

"We not only recognize, but are in full sympathy with, the numerous authorities holding that this act should be liberally construed in favor of shipowners, so as to encourage shipbuilding, and the employment of ships in commerce."

See, also, Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363; Capitol Transportation Co. v. Cambria Steel Co., 249 U.S. 334, 39 S.Ct. 292, 63 L.Ed. 631.

In the light of what has been said, we think limitation of liability here cannot be denied on the ground that the "Stone 6" was not an offending vessel. In addition to the cases cited above, see, also, The John D. Rockefeller, 4 Cir., 272 F. 67, 73; Texas & Gulf Steamship Co. v. Parker, 5 Cir., 263 F. 864; The Zouave, D.C., 122 F. 890; The Julia, D.C., 91 F. 171.

It is only fair to state that there are expressions in a number of cases which appear to sustain the contention of libellants by giving to the term "offending vessel," in connection with the limitation of liability, a narrower interpretation than we have seen fit to give in connection with the instant problem. However, when these cases are carefully read in the light of the facts involved, we cannot interpret these opinions as controlling or as overruling our views and the authorities cited in support thereof. Some of these expressions are now set out.

Thus, in The Laforrest L. Simmons, D. C., 276 F. 61, 62, it was said:

"There were no 'damages done by the vessel' (In re Goodrich Transportation Co., D.C., 26 F. 713) for which she or her owner might be liable."

Mr. Justice Holmes, in Liverpool, etc., Navigation Co. v. Brooklyn, etc., Terminal, 251 U.S. 48, 53, 40 S.Ct. 66, 67, 64 L.Ed. 130, remarked:

"The notion as applicable to a collision case seems to us to be that *if you surrender the offending vessel* you are free, just as it was said by a judge in the time of Edward III, 'If my dog kills your sheep and I freshly after the fact tender you the dog you are without recourse against me.' Fitz. Abr. Barre, 290." (Italics ours.)

And, speaking for this Court, Circuit Judge Waddill, in The Alvah H. Boushell, 4 Cir., 38 F.2d 980, 982, pointed out:

"Under such circumstances, *both tugs are responsible and liable* for the damages arising from such collision, certainly where, as found here by the trial court, and as to which there seems to be no very serious controversy, both were participants in the venture and undertaking, and *both were at fault in bringing about the collision.*" (Italics ours.)

And see the words of Mr. Justice Bradley in his oft-quoted opinion in Norwich Co. v. Wright, 13 Wall. 104, 80 U.S. 104, 120, 121, 20 L.Ed. 585:

924

"The section as construed limits the ship-owners' liability in three classes of damage or wrong-happening without their privity, and by the fault or neglect of the *master or other persons on board* (the offending vessel), viz.: 1st, damage to goods on board; 2d, damage by collision to other vessels and their cargoes; 3d, *any other damage or forfeiture done or incurred.*" (Italics ours.)

We hold that there was fault and negligence on the part of respondent, R. R. Stone, contributing to the collision, and the consequent damage to the cargo and hull of the "Severance." Further, we hold that the petition for limitation of liability should be dismissed. The appellants are, therefore, entitled to a decree in their favor against R. R. Stone. No relief against Thomas H. Stone, an incompetent, or his guardian, was sought in the libel, and the record affords no ground for the liability of either of these. The decree should therefore run only against R. R. Stone.

The decree of the District Court must be set aside and the case is remanded to that Court for further proceedings consistent with this opinion.

Reversed and remanded.